**ANALYTICA, INCORPORATED,**
Plaintiff,

v.

**NPD RESEARCH, INC., Defendant-Cross-Appellant-Cross-Appellee.**

**Appeals of SCHWARTZ & FREEMAN and Pressman and Hartunian Chtd.**

**Nos. 81–2437, 82–1273 and 82–1390.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1982.

Decided May 31, 1983.

Rehearing and Rehearing En Banc Denied Aug. 24, 1983.

Coffey, Circuit Judge, filed a dissenting opinion.

Alex Elson, Rosenthal & Schanfield, Chicago, Ill., for defendant-cross-appellant-cross-appellee.

John R. Fornaciari, Howrey & Simon, Washington, D.C., for plaintiff.

Before POSNER and COFFEY, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

Two law firms, Schwartz & Freeman and Pressman and Hartunian, appeal from orders disqualifying them from representing Analytica, Inc. in an antitrust suit against NPD, Inc. Schwartz & Freeman also appeals from an order directing it to pay NPD some $25,000 in fees and expenses incurred in prosecuting the disqualification motion; and NPD cross-appeals from this order, contending it should have got more.

John Malec went to work for NPD, a closely held corporation engaged in market research, in 1972. His employment agreement allowed him to, and he did, buy two shares of NPD stock, which made him a 10 percent owner. It also gave him an option to buy two more shares. He allowed the option to expire in 1975, but his two co-owners, in recognition of Malec's substantial contributions to the firm (as executive vice-president and manager of the firm's Chicago office), decided to give him the two additional shares—another 10 percent of the company—anyway and they told Malec to find a lawyer who would structure the transaction in the least costly way. He turned to Richard Fine, a partner in Schwartz & Freeman. Fine devised a plan whereby the other co-owners would each transfer one share of stock back to the corporation, which would then issue the stock to Malec together with a cash bonus. Because the stock and the cash bonus were to be deemed compensation for Malec's services to the corporation, the value of the stock, plus the cash, would be taxable income to Malec (the purpose of the cash bonus was to help him pay the income tax

that would be due on the value of the stock), and a deductible business expense to the corporation. A value had therefore to be put on the stock. NPD gave Fine the information he needed to estimate that value—information on NPD's financial condition, sales trends, and management—and Fine fixed a value which the corporation adopted. Fine billed NPD for his services and NPD paid the bill, which came to about $850, for 11½ hours of Fine's time plus minor expenses.

While the negotiations over the stock transfer were proceeding, relations between Malec and his co-owners were deteriorating, and in May 1977 he left the company and sold his stock to them. His wife, who also had been working for NPD since 1972, left NPD at the same time and within a month had incorporated Analytica to compete with NPD in the market-research business. She has since left Analytica; Mr. Malec apparently never had a position with it.

In October 1977, several months after the Malecs had left NPD and Analytica had been formed, Analytica retained Schwartz & Freeman as its counsel. Schwartz & Freeman forthwith complained on Analytica's behalf to the Federal Trade Commission, charging that NPD was engaged in anticompetitive behavior that was preventing Analytica from establishing itself in the market. When the FTC would do nothing, Analytica decided to bring its own suit against NPD, and it authorized Schwartz & Freeman to engage Pressman and Hartunian as trial counsel. The suit was filed in June 1979 and charges NPD with various antitrust offenses, including abuse of a monopoly position that NPD is alleged to have obtained before June 1977.

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, sitting by designation.

 This opinion has been circulated to the full court, pursuant to Circuit Rule 16(e), because of the view expressed in the dissenting opinion that the majority opinion is inconsistent with previous decisions of the circuit. A majority of the circuit judges in regular active service have voted not to hear the case en banc. Judge Pell

and Judge Coffey, however, have voted to hear the case en banc. And Judge Wood has not voted, preferring to have the benefit of the parties' arguments made on petition for rehearing with suggestion for rehearing en banc, should such a petition be filed after they have had an opportunity to study the majority and dissenting opinions, before he votes on whether the case should be heard en banc.

In January 1980 NPD moved to disqualify both of Analytica's law firms. Evidentiary hearings on the motion were held intermittently between April 1980 and May 1981. At one stage the law firms voluntarily withdrew, but when the judge told them that he was minded to make them pay the fees and expenses that NPD had incurred in prosecuting the motion they moved to vacate the order granting their motion to withdraw. The motion to vacate was granted and the hearings resumed. In June 1981 the judge disqualified both firms and ordered Schwartz & Freeman to pay NPD's fees and expenses. Analytica has not appealed the orders of disqualification, having retained substitute counsel to prosecute its suit against NPD.

 We first consider, on our own initiative as we must, whether Pressman and Hartunian has standing to appeal the order disqualifying it. Orders disqualifying counsel usually are appealed by clients upset by the prospect of losing the services of the lawyer of their choice and by the added expense of bringing substitute counsel up to speed. The client's standing to appeal is plain enough and an order disqualifying counsel, though interlocutory, is appealable, at least in this circuit. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 717–20 (7th Cir.1982). If the client wants to keep the lawyer, the lawyer's standing also seems plain, since if the disqualification order stands he will lose the fees he would have made from the case. But in this case the client has not appealed. Analytica appears content with whatever substitute counsel it has procured. We therefore cannot see what tangible object Pressman and Hartunian has in seeking reversal of the order disqualifying it. It has presented no evidence that it will be rehired and we have no reason to assume it will be, since that would require Analytica to replace the trial counsel it has hired in place of Pressman and Hartunian.

Nor need we decide whether an interest in reputation alone could give a lawyer standing to appeal a disqualification. Pressman and Hartunian was disqualified not for anything it did or failed to do but simply because as Schwartz & Freeman's co-counsel it had access, actual or potential, to whatever confidential information Schwartz & Freeman had obtained while representing NPD. It appears that Pressman and Hartunian did not even know about that prior representation and so was innocent in thought as well as deed. That is why the district judge did not require it to pay any of the fees or expenses incurred by NPD in prosecuting the motion to disqualify. The judge thought Pressman and Hartunian had to be disqualified to protect NPD but since the firm's conduct was not blameworthy it need not fear for its reputation.

 Although Schwartz & Freeman has a stronger argument that it has an interest in reputation at stake in this appeal, we need not decide whether that interest is enough to confer standing either. Since Schwartz & Freeman has standing to appeal from the order directing it to pay $25,000 to NPD for resisting the order of disqualification, and since the order to pay is invalid if Schwartz & Freeman should not have been disqualified, the appeal from that order requires us to consider the validity of the disqualification order in any event.

 For rather obvious reasons a lawyer is prohibited from using confidential information that he has obtained from a client against that client on behalf of another one. But this prohibition has not seemed enough by itself to make clients feel secure about reposing confidences in lawyers, so a further prohibition has evolved: a lawyer may not represent an adversary of his former client if the subject matter of the two representations is "substantially related," which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second. It is irrelevant whether he actually obtained such information and used it against his former client, or whether—if the lawyer is a firm rather than an individual practitioner—different people in the firm handled the two matters and scrupulously avoided discussing them.

See, e.g., *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 570–71 (2d Cir.1973); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976); *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir.1980); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1028 (5th Cir.1981), and in this circuit *Cannon v. U.S. Acoustics Corp.*, 532 F.2d 1118, 1119 (7th Cir.1976) (per curiam), aff'g 398 F.Supp. 209, 223–24 (N.D.Ill.1975); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir.1976); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 223–25 (7th Cir.1978).

*⌐* ■ There is an exception for the case where a member or associate of a law firm (or government legal department) changes jobs, and later he or his new firm is retained by an adversary of a client of his former firm. In such a case, even if there is a substantial relationship between the two matters, the lawyer can avoid disqualification by showing that effective measures were taken to prevent confidences from being received by whichever lawyers in the new firm are handling the new matter. See *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, 197 (7th Cir.1979) (en banc); *Freeman v. Chicago Musical Instrument Co.*, supra, 689 F.2d at 722–23; *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252 (7th Cir.1983). The exception is inapplicable here; the firm itself changed sides.

Schwartz & Freeman's Mr. Fine not only had access to but received confidential financial and operating data of NPD in 1976 and early 1977 when he was putting together the deal to transfer stock to Mr. Malec. Within a few months, Schwartz & Freeman popped up as counsel to an adversary of NPD's before the FTC, and in that proceeding and later in the antitrust lawsuit advanced contentions to which the data Fine received might have been relevant. Those data concerned NPD's profitability, sales prospects, and general market strength—all matters potentially germane to both the liability and damage phases of an antitrust suit charging NPD with monopolization. The two representations are thus substan-

tially related, even though we do not know whether any of the information Fine received would be useful in Analytica's lawsuit (it might just duplicate information in Malec's possession, but we do not know his role in Analytica's suit), or if so whether he conveyed any of it to his partners and associates who were actually handling the suit. If the "substantial relationship" test applies, however, "it is not appropriate for the court to inquire into whether actual confidences were disclosed," *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, supra, 588 F.2d at 224, unless the exception noted above for cases where the law firm itself did not switch sides is applicable, as it is not here. *LaSalle Nat'l Bank v. County of Lake*, supra, 703 F.2d at 257–58.

■ Consistently with this distinction, *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1321 (7th Cir.1978)— like this a case where the same law firm represented adversaries in substantially related matters—states that it would have made no difference whether "actual confidences were disclosed" even if the law firm had set up a "Chinese wall" between the teams of lawyers working on substantially related matters, though the two teams were in different offices of the firm, located hundreds of miles apart. Now Schwartz & Freeman has never, in this litigation, contended that it created a "Chinese wall" between Fine and the lawyers working for Analytica against NPD. The offer of proof that it made in the district court was an offer to prove that the individuals in Schwartz & Freeman who were handling Analytica's case against NPD had not received any relevant confidential information about NPD from Fine. This proof would not have established the existence of a "Chinese wall." In *LaSalle Nat'l Bank*, where this court just the other day upheld the disqualification of a law firm that hired a former county lawyer and later was retained to bring a suit against the county, it was not enough that the lawyer "did not disclose to any person associated with the firm any information . . . on any matter relevant to this litigation," for "no specific

institutional mechanisms were in place to insure that that information was not shared, even if inadvertently," until the disqualification motion was filed—months after the lawyer had joined the firm. 703 F.2d at 259. We contrasted the absence of such mechanisms with a case in which the lawyer "was denied access to relevant files and did not share in the profits or fees derived from the representation in question; discussion of the suit was prohibited in his presence and no members of the firm were permitted to show him any documents relating to the case; and both the disqualified attorney and others in his firm affirmed these facts under oath," and with another case where "all other attorneys in the firm were forbidden to discuss the case with the disqualified attorney and instructed to prevent any documents from reaching him; the files were kept in a locked file cabinet, with the keys controlled by two partners and issued to others only on a 'need to know' basis." *Id.* at 258–59. Schwartz & Freeman has never offered to prove—has never so much as intimated—that any "institutional mechanisms" were in place in this case. But we emphasize that even if they were, this would not help Schwartz & Freeman; a law firm is not permitted to switch sides if its former representation was substantially related to its new representation, no matter what screens it sets up.

 Schwartz & Freeman argues, it is true, that Malec rather than NPD retained it to structure the stock transfer, but this is both erroneous and irrelevant. NPD's three co-owners retained Schwartz & Freeman to work out a deal beneficial to all of them. All agreed that Mr. Malec should be given two more shares of the stock; the only question was the cheapest way of doing it; the right answer would benefit them all. Cf. Coase, *The Problem of Social Cost,* 3 J. Law & Econ. 1 (1960). The principals saw no need to be represented by separate lawyers, each pushing for a bigger slice of a fixed pie and a fee for getting it. Not only did NPD rather than Malec pay Schwartz & Freeman's bills (and there is no proof that it had a practice of paying its officers' legal expenses), but neither NPD nor the co-own-

ers were represented by counsel other than Schwartz & Freeman. Though Millman, an accountant for NPD, did have a law degree and did do some work on the stock-transfer plan, he was not acting as the co-owners' or NPD's lawyer in a negotiation in which Fine was acting as Malec's lawyer. As is common in closely held corporations, Fine was counsel to the firm, as well as to all of its principals, for the transaction. If the position taken by Schwartz & Freeman prevailed, a corporation that used only one lawyer to counsel it on matters of shareholder compensation would run the risk of the lawyer's later being deemed to have represented a single shareholder rather than the whole firm, and the corporation would lose the protection of the lawyer-client relationship. Schwartz & Freeman's position thus could force up the legal expenses of owners of closely held corporations.

 But it does not even matter whether NPD or Malec was the client. In Westinghouse's antitrust suit against Kerr-McGee and other uranium producers, Kerr-McGee moved to disqualify Westinghouse's counsel, Kirkland & Ellis, because of a project that the law firm had done for the American Petroleum Institute, of which Kerr-McGee was a member, on competition in the energy industries. Kirkland & Ellis's client had been the Institute rather than Kerr-McGee but we held that this did not matter; what mattered was that Kerr-McGee had furnished confidential information to Kirkland & Ellis in connection with the law firm's work for the Institute. *Westinghouse Elec. Corp. v. Kerr-McGee Corp., supra.* As in this case, it was not shown that the information had actually been used in the antitrust litigation. The work for the Institute had been done almost entirely by Kirkland & Ellis's Washington office, the antitrust litigation was being handled in the Chicago office, and Kirkland & Ellis is a big firm. The connection between the representation of a trade association of which Kerr-McGee happened to be a member and the representation of its adversary thus was rather tenuous; one may doubt whether Kerr-McGee

really thought its confidences had been abused by Kirkland & Ellis. If there is any aspect of the *Kerr-McGee* decision that is subject to criticism, it is this. The present case is a much stronger one for disqualification. If NPD did not retain Schwartz & Freeman—though we think it did—still it supplied Schwartz & Freeman with just the kind of confidential data that it would have furnished a lawyer that it had retained; and it had a right not to see Schwartz & Freeman reappear within months on the opposite side of a litigation to which that data might be highly pertinent.

We acknowledge the growing dissatisfaction, illustrated by Lindgren, *Toward a New Standard of Attorney Disqualification,* 1982 Am. Bar Foundation Research J. 419, with the use of disqualification as a remedy for unethical conduct by lawyers. The dissatisfaction is based partly on the effect of disqualification proceedings in delaying the underlying litigation and partly on a sense that current conflict of interest standards, in legal representation as in government employment, are too stringent, particularly as applied to large law firms—though there is no indication that Schwartz & Freeman is a large firm. But we cannot find any authority for withholding the remedy in a case like this, even if we assume contrary to fact that Schwartz & Freeman is as large as Kirkland & Ellis. NPD thought Schwartz & Freeman was its counsel and supplied it without reserve with the sort of data—data about profits and sales and marketing plans—that play a key role in a monopolization suit—and lo and behold, within months Schwartz & Freeman had been hired by a competitor of NPD's to try to get the Federal Trade Commission to sue NPD; and later that competitor, still represented by Schwartz & Freeman, brought its own suit against NPD. We doubt that anyone would argue that Schwartz & Freeman could resist disqualification if it were still representing NPD, even if no confidences were revealed, and we do not think that an interval of a few months ought to make a critical difference.

The "substantial relationship" test has its problems, but conducting a factual inquiry in every case into whether confidences had actually been revealed would not be a satisfactory alternative, particularly in a case such as this where the issue is not just whether they have been revealed but also whether they will be revealed during a pending litigation. Apart from the difficulty of taking evidence on the question without compromising the confidences themselves, the only witnesses would be the very lawyers whose firm was sought to be disqualified (unlike a case where the issue is what confidences a lawyer received while at a former law firm), and their interest not only in retaining a client but in denying a serious breach of professional ethics might outweigh any felt obligation to "come clean." While "appearance of impropriety" as a principle of professional ethics invites and maybe has undergone uncritical expansion because of its vague and open-ended character, in this case it has meaning and weight. For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public—or for that matter the bench and bar—by the filing of affidavits, difficult to verify objectively, denying that improper communication has taken place or will take place between the lawyers in the firm handling the two sides. Clients will not repose confidences in lawyers whom they distrust and will not trust firms that switch sides as nimbly as Schwartz & Freeman.

Since the order disqualifying Schwartz & Freeman was correct, we must decide whether Schwartz & Freeman's insistence on litigating the question rather than bowing out gracefully was so unreasonable that the district judge could properly find it to be in bad faith; otherwise the order to reimburse NPD's legal fees and expenses was improper. *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1087–88 (2d Cir.1977). By bad faith in this context we mean without at least a colorable basis in law—what in a

malicious prosecution case would be called "probable cause." This court had decided the two *Westinghouse* cases two years before the motion for disqualification was filed in this case, and they were controlling precedents. In its appeal brief Schwartz & Freeman makes a perfunctory effort to distinguish them and then moves on to argue that later decisions in this and other circuits suggest a movement away from those decisions. One would have to move awfully far away to give any solace to Schwartz & Freeman, and we have not found any case that questions the validity of the *Westinghouse* cases on a point relevant to this case. We disagree that the *Westinghouse* cases were overruled by *Novo* or *Freeman*. *Novo* and *Freeman* do not involve a law firm's changing sides—a distinction also implicit in Judge Mansfield's concurring opinion in *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 740–41 (2d Cir.1978), on which Schwartz & Freeman relies, and in Judge Fairchild's dissent from the panel decision (which was reversed en banc) in *Novo,* where he said, "This is *not* a case where a party's former attorney is now representing the adverse party," 607 F.2d at 193 (emphasis added). And *Novo* and *Freeman* cite the *Westinghouse* cases approvingly, see 607 F.2d at 196–97; 689 F.2d at 722 and n. 10, as does our even more recent decision in *LaSalle Nat'l Bank,* see 703 F.2d at 255–57.

▬▬▬ The fact that Schwartz & Freeman is a law firm makes its stubbornness in resisting disqualification less forgivable than if it were a lay client. Cf. *McCandless v. Great Atlantic & Pac. Tea Co.,* 697 F.2d 198, 201 (7th Cir.1983). The district judge was entitled to find that Schwartz & Freeman had acted in bad faith in opposing the motion to disqualify, and therefore to award NPD its fees and expenses.

▬▬▬ NPD's cross-appeal challenging the level of the award has no merit. The district judge found that NPD's counsel had put in excessive, and excessively remunerated, time on the case and he therefore refused to award the full amount sought. His finding was not clearly erroneous and his determination of the reasonable fee was not an abuse of his broad discretion. *Muscare v. Quinn,* 680 F.2d 42, 45 (7th Cir.1982), in fee matters.

Pressman and Hartunian's appeal from the order disqualifying it is dismissed for lack of jurisdiction. The order assessing fees and expenses against Schwartz & Freeman is affirmed. No costs will be awarded in this court.

So Ordered.

COFFEY, Circuit Judge, dissenting.

I am compelled to write separately and dissent as I believe the majority inexplicably refuses to accept or follow the mandates of the court's three most recent decisions on the subject of attorney disqualification. The majority's decision casts aside, without a valid legal basis, this court's reasoning set forth in the recent cases of *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983), *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7th Cir.1982), and *Novo Terapeutisk, etc. v. Baxter Travenol Lab,* 607 F.2d 186 (7th Cir.1979), in which this court took a more enlightened perspective, contemporaneous with the modern practice of law, on the law of attorney disqualification, rejecting the irrebuttable presumption that the knowledge of one attorney in a law firm is shared with the entire firm, and holding that the presumption of intra-firm sharing of confidences is rebuttable. The majority has incorrectly distinguished the holdings of *LaSalle National Bank, Freeman* and *Novo* and instead has reverted to the same over-simplified analysis that existed prior to our three most recent decisions in the area of attorney disqualification. By attempting to distinguish rather than applying the thoughtful rationale of *LaSalle National Bank, Freeman* and *Novo,* the majority's analysis in this case unnecessarily creates a conflict with our prior precedent and therefore can only generate problems and confusion for our district courts and for law firms as they attempt to deal with and reconcile our most recent pronouncements.

Prior to *LaSalle National Bank, Novo* and *Freeman,* the accepted analysis in attorney disqualification matters was summary in nature, and thus if a substantial relationship existed between the prior representation and the present litigation, disqualification would and must automatically follow. *See Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir.1978). This harsh iron-clad rule, however, was modified in *Novo* and *Freeman.* In *Novo,* this court agreed that the presumption that every attorney in the law firm has knowledge of the confidences and secrets of the firm's clients is rebuttable. *Novo,* 607 F.2d at 197. This conclusion is necessary, as we noted in *Freeman,* just four and a half months ago, because "the possible appearance of impropriety . . . is simply too weak and too slender a reed on which to rest a disqualification order . . . ." 689 F.2d at 723. We went on in *Freeman* to address the question of the quality of proof required to rebut the presumption and held that "if an attorney can clearly and effectively show that he had no knowledge of the confidences and secrets of the client, disqualification is unnecessary . . . ." Disqualification motions, as we noted, are drastic measures which courts should hesitate to impose except when absolutely necessary. 689 F.2d at 721.

A review of the facts and holding of this court's most recent decision on attorney disqualification, *LaSalle National Bank,* clearly demonstrates, contrary to the majority's interpretation, that that case does not support an irrebuttable presumption of shared confidences. In *LaSalle National Bank,* the defendant County of Lake brought a motion seeking disqualification of the plaintiff's law firm, on the grounds that one of the firm's associates had formerly been employed as a State's Attorney in Lake County. After determining that there was a "substantial relationship" between the present litigation and the associate's previous work for the County, this court properly determined that the individual associate was precluded from representing the plaintiff according to the guidelines reaffirmed in this opinion. The court then turned to the question of whether the disqualification of one associate automatically required the disqualification of the whole firm,

"Having found that Mr. Seidler was properly disqualified from representation of the plaintiffs in this case, we must now address whether this disqualification should be extended to the entire law firm of Rudnick & Wolfe. Although the knowledge possessed by one attorney in a law firm is presumed to be shared with the other attorneys in the firm, *Schloetter,* 546 F.2d at 710–11, *this court has held that this presumption may be rebutted. Novo Terapeutisk,* 607 F.2d at 197. The question arises here whether this presumption may be effectively rebutted by establishing that the 'infected' attorney was 'screened', or insulated, from all participation in and information about a case, thus avoiding disqualification of an entire law firm based on the prior employment of one member."

Id. at 257 (emphasis added). The court went on to hold that a law firm defending against a disqualification motion *may* rebut the presumption of intra-firm sharing of confidences by demonstrating that a timely and effective "Chinese Wall" has been established to insulate against the flow of confidences from the tainted lawyer to his colleagues in the law firm,

"The screening arrangements which courts and commentators have approved, . . . contain certain common characteristics. The attorney involved in the *Armstrong v. McAlpin* [625 F.2d 433 (2d Cir. 1980)] case, for example, was denied access to relevant files and did not share in the profits or fees derived from the representation in question; discussion of the suit was prohibited in his presence and no members of the firm were permitted to show him any documents relating to the case; and both the disqualified attorney and others in his firm affirmed these facts under oath. 625 F.2d at 442–43. The screening approved in the *Kesselhaut* [*v. United States,* 555 F.2d 791 (Ct.Cl. 1977)] case was similarly specific: all other attorneys in the firm were forbid-

den to discuss the case with the disqualified attorney and instructed to prevent any documents from reaching him; the files were kept in a locked cabinet, with the keys controlled by two partners and issued to others only on a 'need to know' basis. 555 F.2d at 793. In both cases, moreover, as well as in *Greitzer & Locks,* the screening arrangement was set up at the time when the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem."

*Id.* at 259.

The court in *LaSalle National Bank* concluded that the law firm had failed to rebut the presumption of shared confidences *under the facts of that case* since "no specific institutional mechanisms were in place to insure that that information was not shared, even if inadvertently," prior to filing of the disqualification motion.

Contrary to the majority's assertion, *LaSalle National Bank* does not support the majority's reliance on an irrebuttable presumption of shared confidences. Rather, the court in *LaSalle National Bank* expressly held that the presumption of shared confidences is *rebuttable,* and that the presumption may be rebutted if the law firm is able to demonstrate that a timely and effective "Chinese Wall" has been established to prevent disclosure of confidences. The *LaSalle National Bank* decision, like *Freeman* and *Novo,* mandates that Schwartz & Freeman be afforded the same opportunity to rebut the presumption of shared confidences.

The majority seeks to ignore the clear import of the *LaSalle National Bank* case in two ways, both of which are entirely without merit. First, the majority claims that the *LaSalle National Bank* holding is inapplicable to this case because in *LaSalle National Bank* a lawyer switched employment from one firm (or government agency) to another law firm, while in this case a law firm switched sides by representing interests adverse to a former client. However, the *LaSalle National Bank* opinion fails to

make a distinction between a lawyer changing employment and a law firm switching sides, nor does it limit its holding to fact situations involving individual attorneys changing employment, but the majority in this case reads these distinctions into the *LaSalle National Bank* opinion, in a manner which strains the limits of logical legal reasoning. Significantly, both *Freeman* and the *en banc* opinion in *Novo* also fail to allude to the factual distinction which the majority argues is so critical.

Second, the majority contends that Schwartz & Freeman must be disqualified since *LaSalle National Bank* held that, in order to avoid disqualification, a firm must demonstrate that an effective "Chinese Wall" or other safeguard was established early enough to prevent even an inadvertent intra-firm disclosure of a former client's confidences. The fallacy of the majority's reliance on *LaSalle National Bank* is patently obvious—how is a judge supposed to determine whether or not timely and effective safeguards have been established if the law firm is afforded no opportunity to rebut the presumption of shared confidences? The critical point made in *LaSalle National Bank* is that there must be an opportunity to rebut the presumption of shared confidences, and thus *LaSalle National Bank* is diametrically opposed to the majority decision in this case. Ignoring this critical aspect of the *LaSalle National Bank* holding, the majority concludes that Schwartz & Freeman must be disqualified since "Schwartz & Freeman has never offered to prove—has never so much as intimated—that any institutional mechanisms were in place in this case." It is obvious why the record is silent on whether in fact Schwartz & Freeman had established, or even attempted to establish, effective safeguards, such as a "Chinese Wall"—the district court based its disqualification order on an irrebuttable presumption of intra-firm sharing of confidences and emphatically blocked Schwartz & Freeman from presenting their full case to rebut the presumption, much less to even address the question of whether or not a "Chinese

Wall" was in effect at that time or, whether any safeguards were in effect or even contemplated. In fact, the court at one point even went so far as to threaten to strike on its own motion the sparse rebuttal evidence it did allow Schwartz & Freeman to present, and frustrated Schwartz & Freeman's attempt to preserve their attorney-client relationship and their professional reputation, by imperiously stating: "The point is we are dealing with an irrebuttable presumption. . . ." The facts in the record should not be misconstrued to achieve the desired result. The case law of this circuit mandates that Schwartz & Freeman must be afforded an opportunity to rebut the presumption of shared confidences by demonstrating, if possible, that (1) none of the confidences of NPD (the former clients) have been shared with the Schwartz & Freeman attorneys handling the monopolization suit *and* (2) that effective safeguards, such as a "Chinese Wall," were instituted as soon as the attorney or law firm became aware, or as soon as a reasonable attorney should have been aware, of the possible conflict of interest. The crucial point is that they should at least be given an opportunity to rebut the presumption of shared confidences.

Furthermore, the majority's extensive reliance on *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1321 (7th Cir.1978) is clearly unfounded. As we recently recognized in *LaSalle National Bank*, the *Kerr-McGee* case involved "*simultaneous* representation of adverse interests" by the Washington and Chicago offices of a large law firm, and disqualification of the law firm was required since no firm, no matter how large, can represent two sides in a controversy at the same time. (emphasis added). Thus, *Kerr-McGee* is inapposite to this case involving *subsequent* representation of adverse interests. The time elapsed since the prior adverse representation should be one factor to consider in deciding whether the presumption of shared confidences has been rebutted. *See* Liebman, The Changing Law of Disqualification: The Role of Presumption and Policy, 73 Nw.U.L.Rev. 996, 1016 (1979). By analogy, a judge who formerly was a member or associate of a law firm is not barred for life from hearing cases involving his former firm; rather the length of time elapsed since his former employment is one factor the judge must reflect upon and consider in determining if and when to recuse himself.

Applying the *LaSalle National Bank, Freeman* and *Novo* analysis to the facts of this case, I agree with the majority that Attorney Fine (the Schwartz & Freeman attorney acting as ostensible counsel for NPD in the stock transfer matter) had access to confidential financial and operating data which would be vital information in the monopolization suit. I disagree, however, with the majority's conclusion that since Attorney Fine had confidential financial information, the entire Schwartz & Freeman law firm should automatically be disqualified because of an irrebuttable presumption that the confidences acquired in the prior representation were necessarily shared with Page, and with other Schwartz & Freeman attorneys involved in the monopolization suit. Rather, the case law of this circuit mandates that the Schwartz & Freeman firm be afforded the opportunity to rebut the questionable "irrebuttable" presumption that the knowledge of one individual attorney, Fine, was imputed to the entire firm, including Page. In the disqualification hearing, Schwartz & Freeman sought to rebut the supposed irrebuttable presumption by introducing the sworn testimony of Page stating that Fine never in fact did reveal any of NPD's confidences to him (Page) nor to the best of his knowledge to any other member of the firm. The district court emphatically refused to consider this sworn testimony to rebut the questionable irrebuttable presumption, stating that it would allow Schwartz & Freeman to introduce such testimony only as an offer of proof for the limited purpose of making a record for appeal:

"Q. You are aware, are you not, from hearing the testimony of Todd Johnson [President of NPD] that he claims to have communicated to Richard Fine in 1976 information generally concerning

NPD's future plans and strategies, NPD's position in the industry, NPD's prospects for success, NPD's future business investments, and the manner in which NPD carries on its business. Are you aware of that testimony?

"A. I recall the testimony generally.

"Q. Was any such claimed information communicated to you by Mr. Fine?

"Mr. Fornaciari: Objection, your Honor, relevance.

"By The Witness:

"A. No.

"The Court: The objection is sustained, and I should state again in case I have not made it clear for the record that I am simply not going to consider that testimony of Johnson.

"If I were going to consider that testimony of Johnson then obviously I would consider the testimony of Mr. Fine and Mr. Page. But my belief is that I made a mistake in receiving that testimony in the first instance, and I suppose the proper thing for me to do, if a motion were made, is to strike it. No one has made such a motion. Maybe I should strike it on my own motion.

"Mr. Elson: Your Honor, under our theory of the case we would want this in the record anyway.

"The Court: All right. But in any case I want to make it clear that my ruling is simply that this testimony on both sides is irrelevant."

In refusing to consider Page's sworn testimony, the district court relied solely on the *Kerr-McGee* holding of an irrebuttable presumption that the knowledge of one individual attorney, Fine, was imputed to the entire law firm, including Page, to justify disqualifying the Schwartz & Freeman law firm.

"The Court: The point is we are dealing with an irrebuttable presumption that there were confidences."[1]

The irrebuttable presumption that all information is shared among every attorney in a firm ignores the practical realities of modern day legal practice. The practice of law has changed dramatically in recent years, with many lawyers working in firms consisting of 20, 30, 60, 100 or even 300 or more attorneys, and with some firms having offices located throughout the country or even throughout the world. Additionally, the trend within law firms has been toward greater specialization and departmentalization. Surely, it defies logic and common sense to establish a presumption, with no opportunity for rebuttal, that every individual lawyer in such a multi-member and multi-specialized firm has *substantial knowledge* of the confidences of each of the firm's clients. Recognizing these realities of the modern practice of law, we must continue to take a more realistic view toward the law of attorney disqualification by allowing the presumption that confidences have been shared throughout a firm to be rebuttable, as we have held in *Freeman* and *Novo*. The district court's decision to automatically disqualify the entire law firm based on an irrebuttable presumption is unreasonable and unrealistic and is directly contrary to our holdings in *LaSalle National Bank*, *Freeman* and *Novo*.

Recognizing that the district court's decision directly contradicts the mandates of the *LaSalle National Bank, Freeman* and *Novo* holdings, the majority feebly attempts to distinguish those cases and states that they do not apply when the firm itself opposes a prior client and, in effect, "changes sides", but apply only to situations where an individual member of a law firm changes employment. This is "poppycock," a distinction without a difference and one which defies both logic and the practical realities of our modern legal system. First, reason tells us that a law firm is indeed nothing more than a group of individual attorneys who have formed an association to further the practice of law. A clear understanding of *LaSalle National Bank, Novo* and *Freeman* establishes that once

---

1. It should be noted that the district court ruled on the disqualification motion without the benefit of the *Freeman* opinion, which was not decided until sometime after the district court's disqualification order was issued.

the appearance of impropriety has arisen, the law firm, as well as an individual attorney, must be given the opportunity to demonstrate an absence of professional impropriety or misconduct. The point the majority overlooks is that it is irrelevant when analyzing the allegations of impropriety whether the potential conflict emanates from one new associate or from several partners or even, for that matter, the entire law firm. The governing legal principle must be the same regardless of whether the alleged conflict arises from the firm itself changing sides or from an individual attorney changing employment; a lawyer or law firm must be given an opportunity to rebut the inference of professional impropriety by demonstrating that the former client's confidences have not been shared with the individuals involved in the current litigation. Why must a lawyer or law firm be disqualified if in fact, they have no substantial knowledge of the former client's confidences because of the out-dated irrebuttable presumption? The mere existence of a possible conflict of interest is of such serious magnitude that the trial judge must afford the litigants (law firms) a hearing and explore the ethical questions in their entirety, unless there are unrebutted facts in the pleadings on file supporting disqualification.

More importantly, however, the majority's analysis ignores a basic principle of law, fairness to all litigants. I believe that fairness requires that any law firm and/or individual lawyer accused of professional impropriety, questionable ethics, or misconduct be given the opportunity to rebut any and all adverse inferences which may have arisen by virtue of a prior representation, and this court so held in *LaSalle National Bank* and *Freeman*. A law firm should not be disqualified with only a summary proceeding conducted by a judge on a sparse factual record such as in this case. To disqualify a lawyer or law firm, and besmirch their professional reputation, based on a sparse and inadequate factual record and an antiquated irrebuttable presumption is to trip lightly through the valley of due process since due process guarantees, at the very least, fundamental fairness to litigants. *See e.g. Lassiter v. Dept. of Social Services,* 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981).

The right to rebut allegations of impropriety is necessary because of the immediate and often irreparable ramifications as to both client and counsel alike that a disqualification order carries with it. I believe counsel and, in this instance, the law firm should not only be allowed to protect their relationship with their present client but also their good name and reputation for high ethical standards. After all, an attorney's and/or a law firm's most valuable asset is their professional reputation for competence, and above all honesty and integrity, which should not be jeopardized in a summary type of disqualification proceeding of this nature. As court proceedings are matters of public record, a news media report concerning a summary disqualification order, based on a scant record of this type, can do irreparable harm to an attorney's or law firm's professional reputation. We must recognize that the great majority of lawyers, as officers of the court, do conduct themselves well within the bounds of the Code of Professional Responsibility.

Moreover, as we recognized in *Freeman,* disqualification of an attorney may also adversely affect the client as disqualification deprives the individual of the representation of the attorney of his choice and "it may also be difficult, if not impossible, for an attorney to master 'the nuances of the legal and factual matters' late in the litigation of a complex case." 689 F.2d at 720. However, the majority dismisses this important consideration again citing a supposed "fact" which is nothing more than a bald assumption, without any basis in the record, that "Analytica appears content with whatever substitute counsel it has procured ...." A court should order a lawyer or law firm disqualified only after a factual inquiry allowing for subsequent appellate review, if necessary, in the absence of a clear and unrebutted factual basis supporting disqualification. *See General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704 (6th Cir.1982).

A summary procedure, premised upon an irrebuttable presumption founded on a mere *appearance* of professional impropriety, is wholly inadequate when ruling on the question of an attorney's or a law firm's professional ethics. We give every defendant in a criminal case the opportunity to be heard, to confront his accusers and to contest all allegations made against him; in fact, in a criminal case we allow the defendant the additional safeguard of a prosecutor's review before even holding a hearing or grand jury prior to filing an information or indictment. We must provide counsel suspected of a violation of the Code of Professional Responsibility with at least a similar opportunity to defend himself and/or explain any and all allegations of impropriety, unless there is a clear unrebutted factual basis contained in the pleadings on file, if we believe in the fairness doctrine. Today, unfortunately, the majority holds the principle of fairness applies only where "a member or associate of a law firm changes jobs" and not where "the firm itself changed sides." Such a distinction is unwarranted and no doubt opens the door to future confusion and possible unjust results.

Assuming Schwartz & Freeman were unable to rebut the presumption that Attorney Fine had access to the confidences and secrets of NPD, and it appears that they were not, the conclusion that Fine himself would not be allowed to represent Analytica is correct. I do not believe and refuse to accept that his disqualification should *automatically* carry over to the entire firm. It is often times true that knowledge of one or more attorneys in a firm has been imputed to other members of that firm. *See, e.g., Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1321 (7th Cir.1978); *Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures,* 224 F.2d 824, 826–27 (2d Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct.

300, 100 L.Ed. 814 (1956). The time has come to abandon this "irrebuttable" presumption, since the principles of *LaSalle National Bank, Freeman* and *Novo* are equally applicable in this situation. Fairness requires that a law firm, as well as any partner or associate, must be given the opportunity to rebut this presumption. A rebuttal may be accomplished by demonstrating that the presence of a "Chinese Wall" or some other method will *effectively* insulate against any flow of confidences and/or secrets from the tainted attorney to any other member of the firm. This rebuttal requires a case-by-case factual determination, but in any event, the fairness doctrine mandates that the opportunity to rebut the presumption must exist.[2]

I wish to stress that the fact finding process of the trial court can indeed be based on objective and verifiable factors. In determining whether a devised plan can effectively prevent disclosures, the trial court should consider a wide variety of factors. For example, the court should consider the size of the law firm, its structural divisions, the likelihood of contact between a "screened" attorney and one handling an adverse representation, and the existence of a rule prohibiting the "tainted" attorney from sharing in the fees derived from the representation in question. The effectiveness of a plan also depends on what type of routine internal safeguards have been developed in the firm for handling confidential information, such as curtailing access to files by keeping files in a locked file cabinet, with the keys controlled by two partners and issued to others only on a "need to know" basis. *LaSalle National Bank,* at 258–259. The court should also look at the steps the firm has taken to make all members of the firm aware of the ban on exchange of information as well as any steps taken to enforce this ban. *LaSalle National Bank,* at 258–259. Finally, the court must

---

**2.** *See,* Murphy, Vicarious Disqualification of Government Lawyers, 69 A.B.A.J. 299 (March 1983) criticizing perfunctory disqualification of an entire law firm based on the knowledge of one firm attorney, in situations involving former government lawyers entering private practice. The author urges rejection of "the presumption in favor of vicarious disqualification", instead advocating a factual inquiry into the existence of a "screening procedure" within the law firm employing the former government attorney.

keep in mind what should be the lawyer's and the law firm's most valuable assets, their reputations for honesty and integrity, along with competence. While some may argue that this final factor is more subjective than objective in nature, it merely requires an evaluation which district court judges are qualified to make, especially in light of the fact that they make credibility determinations in other cases daily. Only after considering the above factors can a district court make a determination as to whether a devised plan can *effectively* shield a tainted attorney. Reliance upon antiquated notions of disqualification such as irrebuttable presumptions simply will no longer suffice in today's specialized practice of law.

My concern in this area lies in the effect a disqualification motion has on both a law firm as well as a newly hired individual in a firm. In *LaSalle National Bank, Novo* and *Freeman* we gave the newly hired attorney the opportunity to rebut all adverse inferences arising out of his former employment and to prove to the court that he in fact did not have prior knowledge sufficient to disqualify his firm. In *LaSalle National Bank* this court set forth the reasoning requiring the presumption of shared confidences to be rebuttable:

> "If past employment in government results in the disqualification of future employers from representing some of their long-term clients, it seems clearly possible that government attorneys will be regarded as 'Typhoid Marys.' Many talented lawyers, in turn, may be unwilling to spend a period in government service, if that service makes them unattractive or risky for large law firms to hire. In recognition of this problem, several other circuits have begun either explicitly or implicitly to approve the use of screening as a means to avoid disqualification of an entire law firm by 'infection.' The Second Circuit has expressed its approval of the use of screening in a situation where the law firm's continued representation of a client results in no threat of a taint to the trial process. *Armstrong v. McAlpin,* 625 F.2d 433, 445 (2d Cir.1980)

(en banc), vacated on other grounds, 449 U.S. 1106 [101 S.Ct. 911, 66 L.Ed.2d 835] (1981). The Fourth Circuit, similarly, has approved an arrangement under which a former Justice Department attorney's new employer was not disqualified, on the basis that the disqualified individual was denied access to all the relevant files and did not participate in fees from the barred litigation. *Greitzer & Locks v. Johns-Manville Corp.,* No. 81–1379, slip op. at 7 (4th Cir. Mar. 5, 1982). Similarly, the Court of Claims has held that a former government attorney's entire firm need not be disqualified where screening procedures insure that he did not consult with the other attorneys about the case or share in fees derived from it. *Kesselhaut v. United States,* 555 F.2d 791 (Court of Claims 1977)."

This reasoning is equally apt in situations involving a law firm representing interests adverse to a former client. If prior representation of a particular client will irrebuttably disqualify an entire firm from handling certain cases, the result could easily be whole law firms of "Typhoid Marys." This would have a drastic impact on the careers of attorneys in entire firms, would impede clients' rights to be represented by attorneys of their choice and would discourage attorneys with expertise in a particular field of law from handling cases in their respective specialties. Just as in cases of individual attorneys changing employment, such a result must be avoided by allowing the presumption of shared confidences to be rebutted. Fairness demands that we now do no less for the law firm itself.

The majority infers that under my analysis a law firm could conceivably represent opposing sides in the same case. Such a conclusion conflicts with this court's maxim that judges should not "stifl[e] the promptings of common sense." *See Planned Parenthood Association of Chicago v. Kempiners,* 700 F.2d 1115, 1137 (7th Cir.1983). In the absence of stipulated facts supporting disqualification, decisions to disqualify counsel should be made only after a factual inquiry has been undertaken allowing law-

yers an opportunity to rebut all inferences of unethical conduct. The *opportunity* to rebut inferences of professional misconduct or impropriety *must exist, whether the dis-*qualification motion is directed toward an individual lawyer or an entire firm. The majority's irrebuttable presumption is a relic from days long ago past, ignoring the realities of the modern practice of law. "[E]quity demands, and the pragmatics of emerging specialization inherent in contemporary legal practice dictates, that this presumption be rebuttable." *City of Cleveland v. Cleveland Elec. Illuminating,* 440 F.Supp. 193, 209 (N.D.Ohio), *aff'd mem.,* 573 F.2d 1310 (6th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). The time has come to abandon the irrebuttable presumption that the knowledge of one attorney is the knowledge of the entire firm since, as this court recently stated, we should look to the living law, not to that of the dead. *See Norris v. United States,* 687 F.2d 899, 904 (7th Cir.1982).

The majority attempts to justify the irrebuttable presumption by stating "clients will not . . . trust firms that switch sides as nimbly as Schwartz & Freeman." If we accept this as true, the "test of the market" and the law of economics will prevail. A fair and just result will be obtained since the concerned client will select other counsel if he does not trust the present firm. *Cf. Merritt v. Faulkner,* 697 F.2d 761 at 769–770 (7th Cir.1983) (Posner, J., concurring in part and dissenting in part); *McKeever v. Israel,* 689 F.2d 1315, 1325 (7th Cir.1982) (Posner, J., dissenting).

The majority makes a second attempt to justify the irrebuttable presumption of intra-firm sharing of confidences by stating that a law firm's "interest not only in retaining a client but in denying a serious breach of professional ethics might outweigh any felt obligation to 'come clean' ". Evidently, the majority believes that lawyers generally are not to be trusted to honor their ethical obligations. I, on the other hand, believe that the great majority of attorneys, as officers of the court, will and do live up to their ethical duties and "come clean" *if given an opportunity to do so.*

*See generally,* Hazard, *The Lawyer's Obligation to be Trustworthy when Dealing with Opposing Parties,* 33 S.C.L.Rev. 181 (1981). As for those attorneys who chose not to "come clean," the district court distinguishes between the meritorious and the frivolous on a regular basis in other types of cases, and I see no reason why the courts cannot perform that task equally well in the context of attorney disqualification, without relying on an ancient out-dated irrebuttable presumption.

I wish to emphasize there are indeed situations where orders of disqualification are both legitimate, necessary and proper. The attorney-client relationship has been most properly described as sacrosanct and "[i]t is part of a court's duty to safeguard the sacrosanct privacy of the attorney-client relationship." *Freeman,* 689 F.2d at 721. However, the majority's irrebuttable presumption that all confidences are shared among every lawyer in a law firm, even a large multi-office firm, ignores the fact that in many firms, particularly large firms, there is little exchange of confidences between, for example, the antitrust, personal injury, tax, patent, securities or corporate sections of a firm because of the work load and the varied nature of the different department's practices. The majority's analysis fails to give Schwartz & Freeman or even contemplate in the future giving other law firms, large or small, the opportunity to demonstrate to the court the absence of impropriety. By analogy, the solution I advocate has worked well in our jury selection procedure for years. Where a juror states that he/she has information concerning a case, they are not automatically disqualified, but it is a trigger for further questioning to ascertain the degree of involvement, potential relationships or formed opinions in the matter. In essence, we are trusting the judge to perform a fact finding process that has been performed successfully for years. Why in our legal system is a juror entitled to more protection than an officer of the court who has dedicated himself to the highest ideals of our legal profession? Why should not a judge

conduct a meaningful factual inquiry rather than merely relying on an antiquated irrebuttable presumption?

Finally, I disagree with the majority's imposition of fees and expenses upon Schwartz & Freeman as a penalty for defending against the disqualification motion. The majority concludes that Schwartz & Freeman's arguments are without "a colorable basis in law" and are "so unreasonable" as to be in "bad faith." In so holding, the majority denegrates the logic employed by this court in its three most recent decisions pertaining to attorney disqualification, *LaSalle National Bank, Freeman* and *Novo;* all three of these cases expressly hold that the presumption of intra-firm sharing of confidences is rebuttable. Obviously, Schwartz & Freeman's legal argument that they should be allowed to rebut the presumption of shared confidences had at the very least a "colorable basis in law" and was not "so unreasonable as to be in bad faith."

The majority paints a totally inaccurate picture of Schwartz & Freeman's behavior in the trial court, a picture which once again is without support in the record. The majority casts Schwartz & Freeman as nothing but a group of pettifogging attorneys set on running up their fees without concern for truth or moral obligation. An examination of the record, however, discloses a sharply different image as Schwartz & Freeman did at one point move, as the majority puts it, to "gracefully bow out" by withdrawing from the case.

"Your Honor, we advised the court by letter that after discussion of the situation in depth with our client, that we would come to court this morning and ask the court for leave to withdraw as counsel for plaintiff. The request was made on behalf of all the lawyers at Schwartz & Freeman and on behalf of Mr. Futterman and any lawyers in his firm. We do so with a couple of convictions in mind: that it is in the best interests of our client that we withdraw. The motion to disqualify has become a major dispute, is occupying the court's time, is occupying

counsel's time, a terrific amount of energy and effort is being spent on it, and we believe that this is working a terrible hardship on our client and, therefore, that that process is just not productive. We have taken the step of waiving our fee to our client in order to make sure that the motion to disqualify, to the best of our ability, does not cause the effect that such a motion can have on a client. We have done everything that we can to help our client get the case back on track and those are our motives."

After the district court had granted the motion to withdraw, the defendants petitioned the court to assess fees and costs of $65,000 against Schwartz & Freeman. Faced with the onerous prospect of not only losing a client but also being penalized $65,000, Schwartz & Freeman rolled up their sleeves and decided to fight for their cause, rather than rolling over and playing dead. Is a decision to stand up for one's rights the kind of behavior that one should be punished for in our American system of justice?

The district court's order assessing fees against Schwartz & Freeman cannot stand in light of our recent decision in *Overnite Transp. Co. v. Chicago Indus. Tire Co.,* 697 F.2d 789 (7th Cir.1983). In *Overnite Transp.,* the plaintiff brought suit based on a novel interpretation of the Interstate Commerce Act, not previously addressed in published case law. The district court granted the defendant's motion to dismiss, and on appeal this court affirmed. Subsequent to this court's affirmance of the dismissal order, the district court granted the defendant's motion for an order assessing attorney's fees against the plaintiff's attorneys, finding that the attorneys had acted vexatiously in instituting the lawsuit. On appeal from the attorney fee award, this court held that the district court had abused its discretion, stating:

"It is the law of this circuit that the power to assess costs on the attorney involved 'is a power which the courts should exercise *only* in instances of a *serious and studied disregard for the orderly process of justice.'* ... Since there

was a legal basis for Overnite's original position, even though that position was found to be legally incorrect, we hold Overnite's claim for C.O.D. charges cannot be characterized as 'lacking justification,' and therefore the district court abused its discretion when finding the attorney's conduct was vexatious."

*Id.* at 795 (emphasis in original).

The order assessing fees against Schwartz & Freeman must be reversed since, in defending against the disqualification motion, they obviously did not exhibit a "serious and studied disregard for the orderly process of justice." Rather, Schwartz & Freeman presented a legal argument which not only had a colorable basis in law, but which I believe is a correct interpretation of this court's three most recent pronouncements on the law of attorney disqualification. The majority's draconian decision to assess fees against Schwartz & Freeman is a harsh blow to our adversarial process as it "will have a profound chilling effect upon litigants and [will] further interfere with the presentation of meritorious legal questions . . . ." *Overnite Transp.,* 697 F.2d at 795, and is nothing less than an insult to the doctrine of *stare decisis* and a slap in the face of the adversary process. In an idealized world, Schwartz & Freeman might indeed have "gracefully" bowed out, but reality dictates that with a client's interest in being represented by the attorney of his choice, an attorney's professional reputation as well as $65,000 in costs on the line, the proper course was to have proceeded exactly as Schwartz & Freeman did. To conclude otherwise is ridiculous.

In short, the distinction the majority has drawn in this case unnecessarily deviates from the standard we set forth in *LaSalle National Bank, Novo* and *Freeman.* I believe the distinction advocated by the majority is unwarranted, unworkable, and will only confuse the law of attorney disqualification, a developing area of fundamental importance not only to the legal community, but to our society. We are not in a position, based on the incomplete record developed in the trial court, to decide con-clusively whether or not Schwartz & Freeman should be disqualified. Accordingly, I would remand this case to the district court to allow Schwartz & Freeman an opportunity to demonstrate, if possible, that (1) Fine has not disclosed NPD's confidences to any Schwartz & Freeman attorney involved in the monopolization suit; and (2) that some meaningful effective plan has been instituted to ensure that such a disclosure will not occur in the future. Finally, I would not assess attorney's fees against Schwartz & Freeman.