**ORIGINAL APPALACHIAN ARTWORKS, INC.,**
Plaintiff,

v.

**MAY DEPARTMENT STORES COMPANY, et al., Defendants.**

No. 86 C 882.

United States District Court, N.D. Illinois, E.D.

July 9, 1986.

Nate Scarpelli, Terrence McMillin, Marshall, O'Toole, Gerstein, Murray & Bicknell, Chicago, Ill., William H. Needle, P.C., Atlanta, Ga., for plaintiff.

Charles Laff, Larry Saret, Lawrence Robins, Laff, Whitesel, Conte & Saret, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Original Appalachian Artworks, Inc. ("Artworks") sues May Department Stores Company and Venture Stores, Inc. (collectively "May," there being no distinction for present purposes), alleging May has marketed a line of stuffed toy bears similar to Artworks' "Furskins" bears and claiming:

    1. copyright infringement under 17 U.S.C. § 501;

    2. unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125(a);

    3. violations of the Illinois Consumer Fraud and Deceptive Business Practices

Act, Ill.Rev.Stat. ch. 121½, ¶¶ 261–272 and the Illinois Uniform Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 311–317;

4. trademark dilution and injury to business reputation under Ill.Rev.Stat. ch. 140, ¶ 22; and

5. common-law unfair competition.

Artworks has now moved to disqualify May's counsel, Laff, Whitesel, Conte & Saret ("Laff Whitesel"), asserting two distinct conflicts of interest:

1. Laff Whitesel formerly acted as Artworks' attorney.

2. Laff Whitesel currently represents clients whose interests are adverse to May's.

May both opposes the motion and moves for sanctions. For the reasons stated in this memorandum opinion and order, Artworks' motion is denied and May's is granted.

### Factual Background [1]

Artworks claims copyrights in a "family" of four stuffed bears it calls "Furskins." Each bear is designed and accoutered to fit a story line Artworks has developed about the bears' lives and work. Purchasers are entitled to take an "Oath of Furskin Friendship" on a form provided with each bear sold (¶ 10).

May has produced a "family" of six stuffed bears (called "Trappers"), which Artworks says are "substantially similar" to Furskins. That similarity is said to extend to the story line used to market Trappers, including a "Friendship Creed" form provided to purchasers (¶¶ 12, 20). Such similarities in appearance and marketing strategy are the basis for Artworks' copyright, trademark and related claims.

Along with the bears themselves, various ancillary items carrying the Furskins theme (such as stickers, jewelry, wallets and umbrellas, see Artworks R.Mem. Ex. 8) are marketed under license from Artworks. Two of Artworks' Furskins licensees are Southern Treasures ("Southern") and Imaginings 3 ("Imaginings") (Artworks Mem. 2).

According to Artworks Mem. 2, Southern is 100%-owned by Sidney Diamond ("Diamond") and Imaginings is 75%-owned by him.[2] Diamond is either President or Board Chairman (or both) of Diamond Toymakers ("Toymakers"), a division of S. Diamond Associates ("Associates") (compare Artworks R. Mem. Ex. 5 and Ex. 8).

Laff Whitesel has done patent, trademark and copyright work for Associates at least since 1975 (Laff Aff. ¶ 2). Associates and Toymakers are current Laff Whitesel clients (Artworks May 1 Stip.).[3] In April 1984 a Toymakers executive asked Laff Whitesel partner Martin Stern ("Stern") to prepare and file copyright applications for four "Cabbage Patch Kids" vinyl stickers (the "Stickers") because an unauthorized party was marketing identical items in the name of Toymakers, which itself marketed the Stickers under license from Artworks (Stern Aff. ¶ 2). To expedite filing of the copyright applications, the Toymakers executive authorized Stern to sign them (id.). Stern did so, listing Artworks as the copyright claimant and himself as Artworks' "authorized agent" (see Artworks Mem. Ex. A, the four applications). But Stern had no contact at all with anyone at Artworks, and he received from Toymakers only the information necessary to fill out the applications. Laff Whitesel billed As-

---

1. Neither side has requested the evidentiary hearing available under Fed.R.Civ.P. ("Rule") 43(e), nor has there been any discovery directed toward the present motion. Consequently the factual record is thin, and this opinion's factual discussion is necessarily limited. Citations to the Complaint will simply take the form "¶ —."

2. May Mem. 3 says there is "no valid evidentiary support for these factual statements," but it does not deny their accuracy.

3. Given Toymakers' lack of independent legal existence (as an unincorporated division of Associates), it is inaccurate to speak of it as somehow separate from Associates. Because the parties have done so and it makes no substantive difference anyway, this opinion will follow the litigants' lead.

sociates for Stern's work (Stern Aff. ¶ 3 and attached exhibit).[4]

Artworks Mem. 4 says Stern's work has current significance. Artworks has sued Topps Chewing Gum, Inc. ("Topps"), claiming Topps' "Garbage Pail Kids" products infringe Artworks' Stickers copyrights. Artworks suggests Stern may be required to testify in that case.

Beleaguered on several fronts, Artworks has also sued Schlaifer (*Original Appalachian Artworks, Inc. v. Schlaifer, Nance & Co.*, No. C85–4336A (N.D.Ga., filed Oct. 29, 1985)), seeking a declaration that its agreement with Schlaifer for licensing Cabbage Patch Kids products gives Schlaifer no interest in Furskins products. Paragraph 39 of Artworks' complaint in that case (May Mem. Ex. 1) says:

> While certain advertisements and promotional materials for the "FURSKINS ®" bears state that the bears are "Produced by the People that brought you CABBAGE PATCH KIDS ®" or words to that effect, the storyline, motif and trade dress associated with "FURSKINS ®" are entirely different from and in no way derived from "CABBAGE PATCH KIDS ®".

### Laff Whitesel-Artworks Relationship

■ No statute or Rule expressly authorizes motions to disqualify an attorney from appearing in a case. Instead such motions look to federal courts' inherent "supervisory" power (*Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 270–71 (2d Cir.1975)):

> [and] also the duty and responsibility to disqualify counsel for unethical conduct prejudicial to his adversaries.

Accord, *First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 571 F.2d 390, 396 (7th Cir.), *rev'd on other grounds*, 584 F.2d 201 (7th Cir.1978) (en banc).

In the broad sense there are two ways in which a court may "disqualify" lawyers:

1. They may be required to withdraw from representing a particular client in a particular case.

2. They may be stricken from the court's bar, effectively preventing representation of anyone in any case.

Usually the term "disqualification" is applied to the first alternative, while the second typically comes under the "discipline" rubric. Though the distinction as to effect may be clear enough, the causal distinction is not. Federal courts' disqualification principles have evolved in common-law fashion, with Judge Weinfeld's opinion in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y.1953) occupying a seminal position. By contrast, discipline has traditionally been based on the legal profession's self-announced standards as expressed (for example) in the American Bar Association ("ABA") Code of Professional Responsibility ("Code").

In practice, however, the two concepts have tended to merge. As this Court has observed in *Clay v. Doherty*, 608 F.Supp. 295, 301 (N.D.Ill.1985) (emphasis in original):

> This District Court's General Rule 3.54(B), adopted in the exercise of the Court's inherent authority to regulate practice before it (see *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir.1976)), establishes the Code as the standard applicable to lawyer *disci-*

---

**4.** Stern Aff. ¶ 5 volunteers information about another Cabbage Patch Kids-related matter he undertook for Toymakers. At Toymakers' request, in December 1983 he drew up an indemnification agreement between Toymakers and Artworks' Cabbage Patch Kids licensing agent, Schlaifer, Nance & Co. ("Schlaifer"), to protect Schlaifer from liability in a potential patent-infringement suit by a party claiming rights to a process used for producing holographic Cabbage Patch Kids stickers. *That* representation obviously poses no conflict-of-interest problems, but Artworks Mem. 3–4 says Laff Whitesel also acted as Toymakers' counsel in negotiating Toymakers' Cabbage Patch Kids license with Schlaifer, thus making Laff Whitesel familiar with Artworks' licensing terms. However, Artworks' reply memorandum does not repeat that claim, suggesting it accepts Laff Whitesel's assertion (Laff Aff. ¶ 6; Stern Aff. ¶ 4) the firm had no involvement in the Toymakers-Schlaifer *licensing* transaction, which predated the indemnification agreement by almost a year.

*pline.* Although that would not necessarily make the Code the benchmark for lawyer *disqualification* as well, courts have consistently treated it that way.

It is thus tempting to view disqualification as simply a lesser sanction to be employed when a lawyer's conduct is not so egregious as to call for disbarment (or for even less severe discipline). Certainly disbarment is more drastic to the lawyer. But because membership in the District Court's bar is a personal privilege, disbarment is a personal sanction. On the other hand, disqualification often involves a vicarious taint: One attorney's inability to act as counsel frequently requires a whole firm to withdraw (see, e.g., *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1321–22 (7th Cir.1978)). *That* result might in some cases be more drastic to the client. See Lindgren, *Toward a New Standard of Attorney Disqualification*, 1982 A.B.A. Research J. 421, 433–34. Precisely for that reason (*Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982)):

> such motions [to disqualify] should be viewed with caution for they can be misused as techniques of harassment.

Disqualification may thus have a significant impact on a particular case, without at the same time obliging all parties (or the court) to take responsibility for the truly drastic consequences flowing from disbarment. Understandably, then, the grounds for disqualification are really much narrower and clearer than the more ethically and morally oriented language of the Code (or its successor, the ABA Model Rules of Professional Conduct ("Model Rules")[5]) might

suggest.[6] And those grounds stem from the governing principle that proper legal representation requires an unimpeded flow (1) of information from client to attorney and (2) of advice from attorney to client. Every client who entrusts information to an attorney, to enable the attorney to solve his or her problems or advance his or her business, can never really get that information back. Documents may be returned to the client, but the facts they contain can still stick in the attorney's head, consciously or unconsciously.

That explains (at least in part) why Code Canon 4 and its Disciplinary Rules ("DRs") are not limited to privileged communications in the evidentiary sense. Instead they speak broadly of both "confidences" and "secrets"—embracing any of the client's personal, proprietary or inside information. Long after the client has left, an attorney could trade on such information to the client's disadvantage. Accordingly, to feel wholly safe about giving any information to his or her attorney, the client (who by definition can't fully recapture that information) must have the assurance the information will be worthless in the attorney's hands except when it is applied to the client's own interests. Then the client need not fear being as frank with the attorney as the client's best interests require.

In turn that explains why a whole law firm may be disqualified on the strength of one lawyer's client contact. Firms themselves require a free internal flow of information, and even if they did not, it frequently becomes impossible to say what information passed from one attorney to

---

**5.** This District Court's General Rule 3.54(b) (amended not too many years back to eliminate its antiquated reference to the supplanted Canons of Ethics) speaks of the Code and not the newer Model Rules. Of course the latter have no legal force of their own, acquiring such force only insofar as courts adopt them. Though the Model Rules therefore do not supplant the Code for General Rule 3.54(b) purposes, they may serve as an added frame of reference for the common-law type of analysis in disqualification cases. In any event, they point to the same result as the Code here.

**6.** As this opinion has already noted, disqualification is a sanction subsumed within disbarment. Anything that suffices to warrant disbarment would a fortiori cause disqualification—at least of the individual attorney disbarred. But where (as here) no one suggests Laff Whitesel or anyone working there has done anything warranting the stiffer penalty, the following text discussion is fully applicable.

another (*Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 196 (7th Cir.1979) (en banc)). That also helps to explain why disqualification is not necessarily a form of opprobrium, nor does it necessarily reflect a determination that an attorney (or a firm) has in fact breached any moral or ethical precept—except perhaps the rather nice moral or ethical precept that one should not come even close to breaching a moral or ethical precept. Disqualification is rather a mechanism for encouraging the free flow of information today by promising lawyers will not be able to get too close to using that information to their own account tomorrow.

Obviously one of the most common ways a lawyer can use information to his or her own account is to use it to another client's account. More than that, a client's worst nightmare may be that his or her lawyer will use such information against the client in another lawsuit.

Beginning at least with *T.C. Theatre,* federal courts have therefore developed prophylactic rules of disqualification, not only to prevent that nightmare from becoming a reality but also to assure clients they need not be inhibited by their fears. So there are two distinct bases for disqualification when a lawyer represents a client against a former client (*Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983)):

> For rather obvious reasons a lawyer is prohibited from using confidential information that he has obtained from a client against that client on behalf of another one. But this prohibition has not seemed enough by itself to make clients feel secure about reposing confidences in lawyers, so a further prohibition has evolved: a lawyer may not represent an adversary of his former client if the subject matter of the two representations is "substantially related," which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second. It is irrelevant whether he actu-

ally obtained such information and used it against his former client, or whether—if the lawyer is a firm rather than an individual practitioner—different people in the firm handled the two matters and scrupulously avoided discussing them.

One reason for that second branch of disqualification is the undesirability, as a policy matter, of close inquiry by courts into the content of actual lawyer-client communications. Any other approach could seriously impair the privilege that attaches to such communications. *T.C. Theatre,* 113 F.Supp. at 269.

Clearly the "substantially related" branch of disqualification is a stringent one. It may well result in disqualification of lawyers or firms that did absolutely nothing wrong: lawyers or firms that neither had nor used information in the prohibited way. But that is because the rule is not intended to punish. Instead it is intended as a guaranty to clients, and the guaranty cannot be too tightly tailored if it is to inspire confidence.

But neither can that guaranty sweep so broadly as to be seriously unfair to attorneys and their new clients. That would be the result here, and grievously so. To prescind the question whether Artworks was ever actually Laff Whitesel's client (a doubtful proposition at best), that will be assumed arguendo purely to facilitate further analysis. Even so, the extent of that assumed "representation" was extraordinarily narrow. All Laff Whitesel did was to perform the perfunctory task of registering copyrights on the four Stickers—and by Artworks' own account, the creative elements going into Furskins materials (the subject of this lawsuit) are "entirely different from and in no way derived from" Cabbage Patch Kids materials (the subject of the assumed former representation). In fact Artworks has identified *no* points of intersection between the former "representation" and the current dispute.

Recognizing that, Artworks presses two alternative arguments. Neither succeeds.

First Artworks says Laff Whitesel's present role creates an "appearance of impropriety" in violation of Code Canon 9:

A Lawyer Should Avoid Even the Appearance of Professional Impropriety.

Canon 9 was really not devised as an all-encompassing prohibition, intended to ensnare every situation not comfortably within the bounds of Canons 4 and 5 and their associated DRs (which address the confidential-information situation directly).[7] But even if "appearance of impropriety" *were* to be accepted as the standard, the short answer is the "substantial relationship" rule provides the measure of that standard in cases such as this. It marks the boundary where a fair guaranty ends and where unfairness to the attorney and his or her future clients begins. To use Canon 9 as a separate boundary (and one with such imprecise edges at that) is to upset the balance Judge Weinfeld and all those who followed him have thoughtfully and carefully worked out.

Artworks alternatively urges a per se rule of disqualification in cases such as this one, where the assumed attorney-client relationship was cemented by the client's agent (here Toymakers) rather than the client itself. Artworks says it doesn't know what Toymakers may have told Laff Whitesel about Artworks' business, because it was not privy to their discussions. Thus it urges a per se disqualification rule is needed to protect Artworks from the effect of that gap in its present knowledge.

Artworks cites no cases for its novel proposition. But its lack of logic, more than the absence of authorities, defeats it. Whether or not Artworks dealt directly with Laff Whitesel, the scope of the representation was the same: It was limited to registering copyrights for the Stickers. Because that representation and the current lawsuit are unquestionably not substantially related, Artworks must fall back

on the first disqualification prong identified in *Analytica*: actual use of confidential information.

Artworks has identified no such actual use. True enough:

1. This litigation has not progressed very far.

2. Any such hypothetical actual use may not be overt but may merely constitute useful background to Laff Whitesel's litigation strategy.

3. Artworks doesn't know what Toymakers may have told Laff Whitesel, outside of the facts necessary to register the Stickers' copyrights.

But what controls the current motion is that Artworks has made no effort whatever to find out what if anything passed between Toymakers and Laff Whitesel. After all, that is a factual question on which Artworks (as the movant for disqualification) bears the burden of proof. Though discovery on the merits has been stayed by consent of both sides pending resolution of the disqualification motion, Artworks has neither essayed discovery on disqualification issues nor asked for a Rule 43(e) evidentiary hearing. Moreover, both Stern (Aff. ¶ 3) and Laff Whitesel senior partner Charles Laff (Aff. ¶ 4) flatly deny receiving *any* information about Artworks from Toymakers or Associates except what was immediately relevant to the Stickers. Artworks has offered nothing—not even reasonable inferences—to support imposition of the draconian per se rule it advocates.

Finally Artworks suggests the possibility Stern may be called as a witness in its suit against Topps. That possibility poses no ground for disqualification for two reasons:

1. Even if that hypothetical contingency comes to pass, DR 5–102 will not be called into play. Stern will not be called as a witness in *this* litigation.

7. See Shadur, *Lawyers' Conflicts of Interest: An Overview*, 58 Chi.B.Rec. 190, 192 (1977):

It is obvious that this Canon [9], if read and applied literally, could swallow up everything else in the Code—in much the same way that the Golden Rule might be said to encompass

all of the law and the prophets. But is not at all clear whether Canon 9 should or will be so applied, as a type of catch-all whenever no specific prohibition can be found in the Disciplinary Rules to deal with conduct intuitively felt to be wrong.

2. Artworks says Stern has a duty to protect the Cabbage Patch Kids copyright he registered on the Stickers. Even on that arguendo assumption, it does not follow Laff Whitesel cannot attack the Furskins copyrights here. Artworks may perhaps be suggesting (though it does not say so outright) that Stern would hedge his testimony in the Topps suit out of spite developed in this suit. But given Stern's truthful-testimony obligation in any lawsuit and the wholly speculative prospect of his involvement in the Topps suit, Artworks' unarticulated fear is too remote to engage the major guns of disqualification in the present case.

### Laff Whitesel-Diamond Relationship

■ Artworks' second major salvo addresses Laff Whitesel's current representation of Associates and Toymakers. Artworks says because Associates is a closely-held corporation,[8] its sole or principal shareholder Diamond is legally to be considered Laff Whitesel's client. That would render the other Diamond-controlled corporations (Southern and Imaginings) Laff Whitesel's clients as well. And because Southern and Imaginings are Furskins licensees, Artworks would have it that Laff Whitesel is taking a position opposed to its current clients: Southern, Imaginings and Diamond personally. That would be prohibited as a violation of an attorney's duty of undivided loyalty to current clients (*International Business Machines Corp. v. Levin*, 579 F.2d 271, 280 (3d Cir.1978)).

Even if it is wrong about that "close corporation" approach,[9] Artworks alternatively says the facts show Diamond operated Associates, Toymakers, Southern and Imaginings as a single corporate entity. This Court is then asked to "pierce the corporate veil" separating Associates from Southern and Imaginings and to conclude Laff Whitesel's representation of one is representation of all.

That argument may be ingenious, but it is at least suspect analytically. Even if the facts were as Artworks says, piercing the corporate veil is a remedy devised for use *against* a shareholder who operates his or her corporation(s) as an alter ego, in favor of a party seeking to collect assets from that shareholder where the corporate pockets are empty (see *Allied Chemical Corp. v. Randall*, 321 F.2d 320, 323 (7th Cir. 1963)). Artworks instead suggests this Court should disregard Diamond's self-chosen corporate forms to create an entire web of vicarious disqualification. That is really nonsense where Diamond has not only set up three separate corporations but, more importantly for current purposes, where disqualification is sought to be extended laterally far beyond any real-world clients or areas of representation: No one even suggests Laff Whitesel actually did any legal work at all for Southern or Imaginings.

But even if—despite all that—Diamond or Southern or Imaginings (or all three) were somehow reshaped to become Laff Whitesel clients, the conclusion for which Artworks contends does not follow. Southern and Imaginings are indeed Furskins licensees. And one of May's affirmative defenses in this suit is indeed the invalidity

8. Artworks asserts that without proof, but May never denies it.

9. That seems likely. At least on the basis of the cases Artworks cites, the rule is an attorney for a close corporation represents each shareholder with regard to corporate matters and cannot represent one shareholder against the others or the corporation against the shareholders. See *Woods v. Superior Court of Tulare County*, 149 Cal.App.3d 931, 935, 197 Cal.Rptr. 185, 188 (1983); *In re Banks*, 283 Or. 459, 584 P.2d 284, 294 (1978); see also *Opdyke v. Kent Liquor Mart, Inc.*, 40 Del. Ch. 316, 181 A.2d 579, 583–84 (1962). But disqualification is not so infectious as to be transmitted by every attenuated contact. It is an impermissible stretch to say an attorney for a close corporation is also deemed to represent every other corporation in which a shareholder may be significantly interested. Nor does it necessarily follow that such an attorney cannot handle a suit against any such shareholder on a claim wholly unrelated to an intracorporate dispute. Despite those doubts, this opinion will again accept Artworks' assertion arguendo, for it turns out to be of no help to Artworks' position.

of the Furskins copyrights. That still does not mean either (1) Laff Whitesel is opposing its clients or (2) Laff Whitesel is representing a position against its clients' interest.

As to the first point, none of Diamond, Southern or Imaginings is a party to this suit. Their status as Artworks' contract licensees does not make them party to every suit Artworks brings. Whatever the relationship among Diamond, Associates, Toymakers, Southern and Imaginings may be, there is no commonality of ownership between any of those entities and Artworks. Their only commonality is contractual. Nor have any of the Diamond entities sought to intervene here.

As to the second point, Diamond, Imaginings and Southern may repudiate their contracts with Artworks at any time. May correctly says a copyright licensee's best interests are not necessarily served by supporting the copyrights, even if there is a contractual obligation to do so. If the copyrights are adjudged invalid, the licensees' obligation to pay royalties would cease. At the same time competition would become more fierce, with the Trappers bears becoming free to reach the market, but the licensees might make a rational business judgment they stand more to gain from cutting their tie to Artworks than they stand to lose from increased competition in the bear-paraphernalia market.

Thus the relevant standard for undivided loyalty is not met on Artworks' showing, for that standard is an objective one (*Clay*, 608 F.Supp. at 302): whether multiple employment would "likely" involve representation of differing interests. Though it might perhaps be conjectured Diamond could believe "his" corporations' interests would be adverse to the interests Laff Whitesel represents here, Artworks has done no more than identify such a possibility. To go farther than that would be to make a pure guess as to a nonparty's business judgments. Here the litigants have recently stipulated Associates and Toymakers continue to be Laff Whitesel clients. Yet Artworks asks this Court to assume its multi-stage inference-on-inference argument accurately portrays *Diamond's* perception—with no hard evidentiary support for that proposition. In purely objective terms, just the opposite inference seems far more likely.

Of course informed consent is usually the hallmark of proper multiple representation, and no evidence of Diamond's informed consent has been tendered either. But the obligation to obtain such consent arises only when the interests an attorney represents are likely to differ (*Clay*, 608 F.Supp. at 302). Artworks has not shown it is entitled to invoke the informed-consent requirement—once again it has offered no shred of evidence to suggest its scenario is correct.

To be sure, May is wrong in saying Artworks has no standing to assert a conflict-of-interest affecting Diamond, Southern or Imaginings but not itself (see *Kevlik v. Goldstein*, 724 F.2d 844, 847–48 (1st Cir. 1984); *Whiting Corp. v. White Machinery Corp.*, 567 F.2d 713, 716 (7th Cir.1977) (District Court opinion adopted on appeal)). But Artworks cannot force Laff Whitesel's disqualification on the basis of *its* version of what a third party may think its interest to be. And again it can scarcely be ignored that the parties directly in interest—Diamond and his corporations—have voiced no concerns whatever. Absent any evidence at all of where their interest really lies, and given the total credibility of inferences adverse to Artworks' position from the facts presented, Artworks' motion to disqualify must be denied.

## Sanctions

■ May has moved for sanctions under Rule 11 and 28 U.S.C. § 1927 ("Section 1927"). It claims Artworks' motion was not reasonably grounded in fact and was brought with actual bad faith after Laff Whitesel, by letter to Artworks' principal attorneys, advised there was no factual basis for disqualification.

Rule 11 establishes an objective standard. Its test is what "a competent attorney" would reasonably believe "after rea-

sonable inquiry." *Indianapolis Colts v. Mayor and City Council of Baltimore*, 775 F.2d 177, 181 (7th Cir.1985) (quoting *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985)).

Here Artworks has made virtually no inquiry at all. To give it the benefit of the doubt, it may be that some of its assertions might perhaps have had some merit *if* there were evidentiary support to back them up. But the sequence of events paints this motion as a tactical weapon, rather than as a true effort to cleanse the litigation process of undesirable conflicts.

This suit was filed February 5, 1986. Though it is not clear when Artworks became aware Laff Whitesel was May's attorney, by March 19 Artworks' counsel sent a letter to Laff Whitesel suggesting the possibility of a conflict (Laff Aff. attachment). Laff responded immediately, negating the factual premises for Artworks' position. On April 15 both parties agreed to stay discovery pending filing and resolution of Artworks' disqualification motion. That motion was filed the same day, with no evidentiary support other than (1) copies of the Stickers' copyright applications prepared by Stern (referred to in Artworks' original letter and already explained to Artworks in Laff's answer) and (2) a copy of the now-admitted-to-be-irrelevant license agreement between Associates and Schlaifer. All that bespeaks a hasty move without adequate preparation.

There are of course good reasons to file colorable disqualification motions promptly. Attorneys ought not to delay in bringing conflicts to the court's attention (see Code DR 1–103(A)). Moreover, prompt resolution of disqualification issues prevents a lot of wasted time and significant disruption that could be created if such a motion were not presented until the case is more advanced.

Thus it might superficially seem this Court is confronted with a conflict of policies. But the conflict is a false one. It is one thing for a litigant to identify a possible conflict-of-interest problem. It is quite another (1) to force the opposing party to incur the cost of defending a motion to disqualify, asserted without adequate factual investigation, then (2) to fail to request discovery or an evidentiary hearing even after the factual inadequacies of the motion become patent (as they should have been to the movant from the outset). Such behavior itself calls proper attorney conduct into question.

Rule 11 principles mandate an award of fees and costs against Artworks for filing this motion without reasonable inquiry into its factual basis. That is a sufficient sanction (and source of sanctions), and throwing in Section 1927 adds nothing more.

*Conclusion*

Artworks' motion to disqualify Laff Whitesel as May's counsel is denied. May's motion for Rule 11 sanctions—the imposition of May's attorneys' fees on Artworks—is granted. To minimize (or even avoid) the need for an evidentiary hearing (with its potential for "fees on fees"), this Court urges counsel to seek agreement in as many areas as possible on the relevant factors (such as time spent, hourly rates and so on). Thereupon May should submit a fees petition, together with a statement of the issues upon which the parties have agreed and those on which they have disagreed. This Court will establish the procedures appropriate to carry on from that point.

Meanwhile this Court's order staying discovery is vacated. Discovery should resume promptly. This action is set for a status report August 12, 1986 at 9:15 a.m.