Terrence DONOHOE, et al., Plaintiffs,

v.

CONSOLIDATED OPERATING &
PRODUCTION CORP., et al.,
Defendants.

No. 86 C 7543.

United States District Court,
N.D. Illinois, E.D.

June 28, 1988.
Supplemental Opinion July 27, 1988.

Herbert Beigel, Bruce Rose, Beigel & Sandler, Chicago, Ill., for plaintiffs.

Douglas R. Roller, Clifford E. Berman, Rooks, Pitts & Poust, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Terrence Donohoe ("Donohoe") and 53 other investors have sued Consolidated Operating & Production Corporation ("COPCO"), Morando Berrettini ("Berrettini"), Jack Nortman ("Nortman"), Dennis Bridges, Ona Drilling Corporation and Onshore Rig Corporation in a nine-count Complaint, alleging defendants defrauded plaintiffs in the marketing and operation of four limited partnerships (collectively the "COPCO Partnerships") in which plaintiffs invested. COPCO, Berrettini and Nortman[1] now move to disqualify plaintiffs' counsel Herbert Beigel ("Beigel") and members of his current law firm (Beigel & Sandler, "B & S") because Beigel's former firm (Barnett & Beigel, Ltd., "B & B") once represented Berrettini. For the reasons stated in this memorandum opinion and order, the motion is denied.

---

1. For convenience COPCO, Berrettini and Nortman will be referred to collectively as "Defend- ants," even though the other defendants are not involved in the current motion.

*Background*[2]

Berrettini was a general partner in O'Hare Executive Towers, Ltd. ("OET"), the developer of an office building. In 1980 he consulted attorney Harvey Barnett ("Barnett") about a dispute between OET and Inland Construction Company ("Inland"), the general contractor on the office building.

Barnett accepted representation of OET on behalf of B & B (D.Ex.A). Because OET had earlier entered into an agreement settling its disputes with Inland, Barnett concluded that OET's only chance for success was a claim for rescission of that agreement on the ground that Inland had imposed economic duress on OET (*id.*).

In early 1981 Barnett filed suit on behalf of OET's general partners against Inland in Circuit Court of Cook County Case No. 81 CH 1279 (the "OET litigation"). OET charged Inland with duress, necessarily putting in issue OET's ability to withstand the economic pressure Inland had allegedly applied to it (D.Ex.B [the Amended Complaint in the OET litigation] at 7–8). Thus Inland's Second Request for Production of Documents (D.Ex.C) in the OET litigation sought Berrettini's financial statements for 1979 through 1981, presumably to explore that issue.[3]

When B & B began representing OET in early 1981, the law firm comprised three attorneys, with Barnett and Beigel the only shareholders. From that time until the firm disbanded April 1, 1983, it never had more than four lawyers (although the identities of Barnett's and Beigel's associates changed from time to time). Barnett's practice primarily involved real estate liti-gation, while Beigel's was limited to securities and commercial litigation. After Beigel and Barnett separated, the latter (and his new firms) continued to represent OET through eventual settlement of the litigation in 1985.

Since 1983 Beigel's affiliations have gone through a number of transformations. In mid–1986 Beigel undertook representation of the plaintiffs, later filing his appearance and the initial complaint in this action on October 3, 1986 (while he was a member of Beigel & Lichtenstein). In the Third Amended Complaint (filed March 16, 1987) Beigel's firm was identified as Herbert Beigel & Associates, Ltd. Finally, on April 23, 1987 the Fourth Amended (and current) Complaint was filed, this time by B & S.

Thus plaintiffs have been represented at all times by a firm in which Beigel was a principal. Indeed, examination of the pleadings and memoranda in this Court's chambers file shows Beigel has been personally involved in the case from its inception.

*Lawyer Disqualification Principles and Their Application*

As this Court has said in *Original Appalachian Artworks v. May Department Stores Co.*, 640 F.Supp. 751, 755 (N.D.Ill. 1986):

> [A] client's worst nightmare may be that his or her lawyer will use [confidential] information against the client in another lawsuit.

And that prospective nightmare is intensified by the need for a free flow of information—for the reposing of confidences and secrets[4]—to make the client-lawyer rela-

---

**2.** Neither side requested an evidentiary hearing in its initial submission, although Defendants' reply memorandum requested such a hearing if this Court should determine their motion could not be granted based on the factual submissions. This section therefore draws from both sides' evidence, noting where they differ. And as the textual discussion of the merits makes plain, it would serve no useful purpose to grant Defendants' request for such a hearing.

**3.** It does not really matter why Inland asked for the information. What does matter is that it did so.

**4.** More often than not, this opinion may simply use the term "confidences" rather than the more accurate "confidences and secrets." Of course "confidences"—privileged matters—do not mark the bounds of the lawyer's obligation. It extends to both categories of information defined in Code of Professional Responsibility DR 4–101(A):

> "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embar-

tionship truly effective. Little wonder, then, that courts have raised high barriers to prevent lawyers from violating such confidentiality even after the relationship has ended.

Berrettini does not say Beigel has disclosed any confidence he obtained from Berrettini in the course of the OET litigation. But that does not matter, because it is well settled that the grounds for disqualification are far more broad than that. As *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir.1983) (citations omitted) put it:

> For rather obvious reasons a lawyer is prohibited from using confidential information that he has obtained from a client against that client on behalf of another one. But this prohibition has not seemed enough by itself to make clients feel secure about reposing confidences in lawyers, so a further prohibition has evolved: a lawyer may not represent an adversary of his former client if the subject matter of the two representations is "substantially related," which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second. It is irrelevant whether he actually obtained such information and used it against his former client, or whether—if the lawyer is a firm rather than an individual practitioner—different people in the firm handled the two matters and scrupulously avoided discussing them.

This case is very close to the most frequent situation in which disqualification is urged. In that "standard" case Client is represented by Lawyer A, a member of Firm 1. Lawyer B is also a member of Firm 1 but then leaves to join Firm 2. Then another member of Firm 2, Lawyer C, accepts representation ·adverse to Client and Client cries foul, seeking to disqualify both Lawyer C and Firm 2 from the representation. In the standard case, whether

disqualification is appropriate depends on three links in the flow of confidential information:

1. Did Client convey confidences to Lawyer A?

2. Did Lawyer B obtain the information (directly or indirectly) from Lawyer A?

3. Did Lawyer C obtain the information from Lawyer B? [5]

Yet because a client has the right to preserve his or her confidences, and because that right would be lost if the client had to reveal the confidences to prove any link in that chain, courts do not demand proof of the actual flow of information. Rather a series of presumptions (sometimes rebuttable, sometimes not) has developed to ease a client's burden.

In this case the third link need not be discussed at any length. Beigel (who corresponds to Lawyer B) has been intimately involved in the adverse representation—no further tie-in is needed in that respect. Moreover, there is no suggestion of an attempt to build a "Chinese wall" (see, e.g., *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 257–59 (7th Cir.1983)) between Beigel and other firm members— quite the contrary—so if he were to be disqualified, his firm and each lawyer in it would have to be as well.

What plaintiffs rely on to avoid Beigel's disqualification is their assertion that each of the first two links is broken. They can be examined in turn.

### 1. Did Barnett Obtain Confidences from Berrettini?

■ It would defeat the very purpose of the disqualification motion—preserving client confidences—if in order to obtain disqualification any client were forced to reveal what had earlier been told to his or her lawyer. Instead this Court must look at the substance of the two allegedly related

rassing or would be likely to be detrimental to the client.

Any use of "confidences" alone in this opinion should be understood as a convenient, though technically imprecise, shorthand reference to both categories of protected information.

5. Of course there is a fourth link in this conceptual chain: Did Lawyer C use the information against Client? But that has already been discussed. It is enough that Lawyer C has accepted representation adverse to Client.

representations to determine whether the ex-client would likely have revealed information relevant to the current matter to an attorney representing him or her in the earlier matter. *LaSalle National Bank* describes a three-part inquiry (703 F.2d at 255–56 (citations omitted)):

> First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

If those three factors are resolved affirmatively, it is presumed the attorney received confidential information, though that presumption may be rebutted (*id.* at 256).

Berrettini says he gave Barnett three types of confidential information relevant to this case during the course of the OET litigation:

1. details about the COPCO limited partnerships (Berrettini Aff. ¶ 9);

2. details about his involvement in other investments and ventures, which this Court reads to mean other than OET and COPCO (*id.* ¶ 8); and

3. details about his personal finances and background (*id.* ¶¶ 6, 7).

Defendants say each of those disclosures meets the three-part test of *LaSalle National Bank*.

■ As a preliminary matter, plaintiffs contend Berrettini was never Barnett's client, so there was no confidential relationship. That is plainly wrong. On that score the critical issue is whether Berrettini sought legal advice from Barnett at the time he made the disclosures (*Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1318–20 (7th Cir. 1978)) ("*Westinghouse I*"), not simply the identity of the entity paying the bill or on whose behalf legal papers were eventually filed.

■ Berrettini says he saw himself as Barnett's client (Berrettini Aff. *passim*),

and it would be entirely reasonable for him to have done so. Though OET might be labeled the "real party in interest" in the OET litigation and though it paid B & B's bills, Berrettini was one of the general partners in OET and was entitled to expect his confidences to be respected. *Westinghouse I* really controls. It holds the members of an unincorporated association have a confidential relationship with attorneys hired by the association, such as to protect their disclosure of confidential information to the attorneys. A fortiori a partner necessarily enjoys the same rights.

Plaintiffs cannot then cut the inquiry off at the beginning. This opinion must turn to assessing each of the asserted confidential disclosures.

### A. COPCO Itself

It is extremely unlikely that Berrettini would have disclosed any details of the COPCO limited partnerships to Barnett in the course of the OET litigation, particularly at a time when B & B was still a firm. Berrettini himself acknowledges he did not make any COPCO disclosures for the direct purposes of the OET litigation. What he says is that he would not have disclosed COPCO–related information to Barnett in the absence of the confidential relationship.

■ Of course an attorney should preserve all of a client's confidences and secrets, not just those obtained for purposes of a specific case or those subject to the attorney-client privilege (see n. 4). But the issue here is whether the fact of disclosure can be presumed in light of the needs of the OET litigation. Clearly it cannot. In that litigation the issue was OET's ability to withstand economic pressure in October of 1980. Details about partnerships marketed two and one-half years later would have no bearing on that score.

Even if it could be found that details of the COPCO partnerships might have been disclosed during the OET litigation, it is really a highly attenuated possibility (at best) that such disclosure would have taken place during Barnett's association with Beigel. B & B split up the selfsame day

the initial COPCO partnership was first offered. True enough, the private placement memorandum must have been in the works for some time, so it is theoretically possible that Berrettini said something to Barnett before B & B was dissolved. But Barnett did not represent Berrettini on COPCO matters, so there would have been no direct occasion for him to have been apprised of the incipient deal. It is far more likely that any disclosure would have occurred (if at all) during the ensuing two years of the OET litigation, when the COPCO partnerships were active.

Berrettini's affidavit is unclear on the timing of his claimed disclosures.[6] However, no evidentiary hearing is needed to pin down the date of putative disclosure, because of the already-reached conclusion that such disclosure would have been extraordinarily unlikely as part of the OET litigation while Beigel was associated with Barnett.

### B. and C. Other Investments and Financial Statements

It is far more reasonable to presume Berrettini would have given Barnett information about his other investments and his financial condition in the course of the OET litigation. OET's financial condition was one of the central issues in the OET litigation, and the very nature of partnership liability brings the financial condition of OET's general partners into that inquiry. It would surely be reasonable for one of OET's general partners to have told his attorney about his financial position and about the condition of his other investments. Such information, particularly if it showed Berrettini was overextended or had other troubled investments, would be relevant to OET's duress claim.

Indeed, Inland requested Berrettini's financial statements for 1979 through 1981. While the document request is undated and there is no indication in this record that Berrettini supplied those statements to Inland, it is certainly reasonable to assume Berrettini supplied similar financial information to his attorney early in the OET litigation.

That, however, is merely the introduction to the real difficulty here: assessing whether the type of information likely to have been disclosed to Barnett in the OET litigation is the same type likely to have relevance now in this case. Berrettini finds such relevance in plaintiffs' assertions that the COPCO principals (1) commingled COPCO partnership monies with funds for other ventures and (2) used COPCO partnership funds for personal purposes. Because information as to Berrettini's financial status would tend to show whether he needed to divert COPCO funds, Defendants say that information is relevant here.

Our Court of Appeals has had few opportunities to discuss the standard of relevance in applying the "substantial relationship" test. Usually the relevance and relationship between the two representations have been clear: representations involving the same litigation (*Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir.1982)), or involving work on a contract and then litigation arising from that contract (*LaSalle National Bank*, 703 F.2d at 253–54) or involving work in obtaining a patent followed by litigation challenging that patent (*Novo Terapeutisk Laboratorium A/S v. Baxter*

---

**6.** Berrettini Aff. ¶ 9 says he made the disclosures "as a result of my confidential relationship with Mr. Barnett" and would not have done so "but for the attorney-client relationship which existed between me and Barnett & Beigel, Ltd." That suggests Berrettini made the disclosures during B & B's life, even though the date is not specified. Yet other portions of the affidavit suggest that is not Berrettini's meaning. Each of Paragraphs 5 through 8 begins with the phrase "During the course of Barnett & Beigel, Ltd.'s representation of me in the [OET] litiga-

tion ..." and goes on to aver certain disclosures were made. Paragraph 11 says in part "the prior representation was concluded in April of 1985." Those statements, when read together, strongly suggest Berrettini is saying nothing more than that he made the disclosures sometime between 1981 and 1985. It is inappropriate to use the extrinsic fact that B & B was dissolved in 1983 as a basis for reading Berrettini's statements as saying the disclosures were made before then, when the clear import of the affidavit as written is otherwise.

*Travenol Laboratories, Inc.,* 607 F.2d 186, 196 (7th Cir.1979) (en banc); *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 710 (7th Cir.1976)). Only *Analytica* and *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221 (7th Cir.1978) ("*Westinghouse II*") discuss the issue in any detail.

In *Westinghouse II* the defendant had disclosed to its attorneys confidential information as to its uranium reserves and production. In that situation the District Judge concluded the information was relevant to an antitrust claim based on restriction of output, but he reasoned there was no substantial relationship between the earlier representation and the antitrust case pending before him (a price fixing claim) (see 588 F.2d at 226). Our Court of Appeals reversed on the ground that an agreement to restrict output *was* price fixing, so the information disclosed by defendants was directly relevant to plaintiff's case (*id.* at 226–27).

In *Analytica* the attorney had obtained confidential information as to "NPD's profitability, sales prospects, and general market strength" (708 F.2d at 1267), then later proceeded to charge NPD with monopolization of its market. Even though the prior representation had nothing to do with antitrust matters (the attorney had been retained to draft a contract), the obvious central importance of the information to a monopolization claim mandated the finding of a substantial relationship to that later antitrust action.

■ Information about Berrettini's finances and other investments is not as central to plaintiffs' case as were the disclosures in *Westinghouse II* or *Analytica.* Ordinarily (and most convincingly) plaintiffs would be expected to show commingling or misapplication of partnership funds through direct evidence, not by inference that such misconduct probably occurred— an inference sought to be drawn from the general partners' financial condition. But neither *Westinghouse II* nor *Analytica* purports to assay the outer bounds of relevance in this context, and the first of those cases teaches (588 F.2d at 226):

> Relevance, however, must be measured against the potential avenues of proof and not against the expected.

Berrettini's financial condition is relevant— in the sense of logically probative—to plaintiffs' claims, even if only marginally or tangentially so.

Plaintiffs have one more arrow in their quiver. In the OET litigation the issue was Berrettini's financial position as of October 1980, but here the issue is his motive to commingle or misapply funds in 1983. Plaintiffs are quite right in urging such a time difference substantially reduces the probative force in this case of any information Barnett is likely to have obtained in the OET litigation. But the lapse of time does not totally deprive that information of logical relevance. It must also be remembered that the standard applicable here is one that bears on the lawyer's total activity in preparing a lawsuit, not simply on the admissibility of evidence at trial. That brings into play a criterion related to the low threshold of Fed.R.Civ.P. 26(b)(1)—for example, whether the information could be used in helping an attorney frame discovery requests.

In sum, it must be concluded that the information assertedly disclosed in the prior proceeding is of the same kind likely to be relevant to this action. All the same, it must also be recognized that Defendants have survived this stage of the analysis by no better than a narrow margin.

*2. Did Barnett Share Confidences with Beigel?*

■ Because the efficient practice of law often requires attorneys within a law firm to discuss client confidences, courts presume that has in fact been done (*Freeman,* 689 F.2d at 722). Despite *Freeman*'s explicit holding that the presumption can be rebutted by clear and effective evidence (*id.* at 723), the language this opinion has already quoted from the later *Analytica* opinion [7] suggests otherwise. That reading

---

**7.** See the second paragraph of the discussion under "Lawyer Disqualification Principles and Their Application."

of *Analytica* gains force from Judge Coffey's vigorous dissent there, in which he urged, as one basis for his disagreement with the majority, that the presumption of shared confidences could be rebutted (708 F.2d at 1272). Since then Judge Coffey has written for the Court, holding the presumption of shared confidences within a firm can be rebutted (*Schiessle*, 717 F.2d at 420, citing *Freeman*, 689 F.2d at 723):

> [W]e must determine whether the attorney whose change of employment created the disqualification issue was actually privy to any confidential information his prior law firm received from the party now seeking disqualification of his present firm. The evidence presented to rebut this presumption must "clearly and effectively" demonstrate that the attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior representation.

Both parties here do assume that Beigel can attempt to rebut the presumption that Barnett shared Barrettini's confidences with him. Given the mixed signals that have emanated from the Court of Appeals, this Court will accept *Schiessle* as the latest—and hence definitive—word on the subject.

■ Beigel's evidence that he received no confidential information consists primarily of his own affidavit. He says in sum:

1. B & B's practice was divided between real-estate-related litigation, handled exclusively by Barnett, and commercial and securities litigation, which Beigel alone handled.

2. Beigel has only a vague recollection that B & B at one time was involved in a matter related to OET, and after reviewing his time sheets he is sure he never discussed the matter with Barnett.

3. He first heard Berrettini's name in 1986 when he was asked by Donohoe to represent plaintiffs in this case.

Those assertions are really not inconsistent with what Berrettini and Barnett say. Berrettini acknowledges (by implication) that he never spoke directly to Beigel in the course of OET. Barnett says two things:

1. In his first affidavit (proffered by defendants) he says the OET litigation was a major matter that he would have discussed with Beigel.

2. In his second affidavit (proffered by plaintiffs) he says he has no recollection of discussing OET with Beigel, but if he did it would have been merely on procedural matters.

Considered as a whole, those submissions fall short of clearly and effectively rebutting the presumption of shared confidences between Barnett and Beigel. Three reasons support that Scotch verdict of "not proven."

First, the absence of time entries for OET in Beigel's records is insufficient to show Beigel did not obtain confidential information about Berrettini. Beigel may indeed have been scrupulously careful to record all time he spent discussing a matter, even if he did not bill for it. Yet confidences can be revealed in the briefest of conversations (or even through an overheard conversation, a misrouted memo or an item read on a secretary's desk) without the matter finding its way into the timekeeping system that serves as the potential basis for billing decision. As a practicing lawyer, this Court was meticulous (other partners might have said compulsive) about the instantaneous—rather than end-of-the-day or even less contemporaneous—recording of time spent on matters. But every timekeeping system has a minimum unit of time (ours was in tenths of an hour, more fine-tuned than most firms, whose minimum entry was and still is a quarter hour). In real world terms it defies experience to credit the notion that *everything*, however brief, done or spoken by a lawyer finds its way ito the time records.[8]

8. D.R. Mem. 19 sought to respond to the Beigel Affidavit's discussion of his timekeeping by quoting the panel opinion in *Novo Terapeutisk,* 607 F.2d at 189:

> A confidence can be revealed on a related subject matter in a brief moment and without the client being charged a nickel.

Second, while Barnett does not contradict Beigel's assertion that they never discussed OET, neither does he really support it. Rather the crux of Barnett's two affidavits seems to be "I don't remember whether I discussed OET with Beigel at all, but if I did I probably didn't reveal any confidences." That sort of equivocal testimony is not the stuff of which a "clear and effective" showing is made.

■ Third and most important, Beigel's denial that he obtained any of Berrettini's confidences is not alone sufficient to rebut the presumption of shared confidences. *Freeman* is instructive on that point. There one of the attorneys (Cohen) in the firm representing Freeman changed jobs, and his new firm was eventually brought in as co-counsel for Chicago Musical Instrument Company (689 F.2d at 716–17). Cohen's affidavits sought to show he had not disclosed any Freeman secrets to the new client (*id.* at 723). In that situation the District Judge declined to consider the affidavits, apparently treating the presumption of shared confidences as irrebuttable (*id.* at 722–23). Our Court of Appeals reversed and remanded for an evidentiary hearing, indicating (*id.* at 723):

> A district court, in resolving this issue, may of course rely on any number of factors, among them being the size of the law firm, the area of specialization of the attorney, the attorney's position in the firm, and the demeanor and credibility of witnesses at the evidentiary hearing.

Unfortunately for Defendants, the panel's opinion was vacated and the en banc court reached the opposite conclusion on the ultimate issue of disqualification. Nevertheless, the full court echoed the panel's sentiments (if not its words) on the subject of disclosure (*id.* at 195, en banc):
> Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences.
Surely the thrust of the original panel's statement (and the en banc paraphrase) is well taken. Confidences, whether between client and lawyer or between lawyers, can be shared in a moment.

**9.** Again this Court has no intention of impermissibly substituting judicial notice for evidence, but it began the practice of law as the only

As that recital suggests, the inquiry should properly focus primarily on whether the structure of the law firm is such that it is unlikely the attorney had access to a client's secrets, rather than on whether despite that access the lawyer says he or she happened not to acquire them.

Beigel does point to one such factor: He and Barnett had different specialties and thus did not work together on matters. But a host of other factors point the other way. B & B was never more than a four-lawyer firm. Barnett's first affidavit says (¶ 6):

> The office structure was very informal and we would discuss different cases including this matter [the OET litigation], from time to time among the lawyers in the office.[9]

Similarly, B & B's retainer agreement with the OET partners presumes an associate would be working on the matter (though the evidence before this Court does not show whether that actually occurred). One B & B associate continued to practice with Beigel after B & B dissolved, and she represents still another way in which Berrettini's confidences might have reached Beigel or his current firm. None of the submissions says anything about clerical support, but in such a small firm it is almost a certainty that Barnett and Beigel shared clerical workers at some time. Finally, Beigel has not denied that he had access to the OET files.

In view of all the factors showing Beigel had access to whatever confidences Berrettini posed with Barnett, his statement to associate in what had up to then been a three-partner law firm. As a result of deliberate efforts to keep the size of the firm small (for many reasons, including the desire for quality control and maximization of interpersonal relationships), we managed to avoid expanding beyond six lawyers for some few years. From both personal experience and from discussions with many other small-firm practitioners, this Court knows Barnett's description rings true: Everyone in the office has a very good notion of what everyone else is doing, and interchange takes place continuously among the lawyers of information, of questions, of ideas on matters for which any one lawyer has primary responsibility.

the effect that he never actually obtained such confidences cannot "clearly and effectively" overcome the presumption that he did.[10] No evidentiary hearing is needed to confirm that. Once more, however, Defendants have scored only a close-won victory on the issue.

### 3. Should B & S Be Disqualified?

To this point this opinion has concluded that:

1. Berrettini is not likely to have shared any confidences about COPCO with Barnett during the course of the OET litigation.

2. However, Berrettini is likely to have revealed confidences about his personal finances and other investments during the course of that litigation, and that information would be marginally relevant in this case. Beigel has not clearly and effectively rebutted the presumption that he shared those confidences.

Thus the standards for disqualification of B & S, as posed in the Seventh Circuit decisions, have been met—albeit barely, in light of the marginality of some of the supporting determinations.

One additional factor must give serious pause, though. Beigel represented plaintiffs in this action for over a year before the motion to disqualify was filed. By the time of that filing he assuredly had ample opportunity to use or disclose to his clients any confidential information he might have had. That calls into question whether any purpose that might be served by disqualifying B & S at this time justifies the adverse impact of doing so.

Our Court of Appeals has never really discussed this issue. Its cases appear to hold that once it is established that there is a "substantial relationship" between the two representations, and once the various presumptions of shared confidences that arise as a result of that finding are not

rebutted, disqualification is automatic. But the context in which each case has reached that result—with one exception to be discussed shortly—has been at the outset of litigation or of a firm's representation of an adverse interest.

Both the substantial relationship test and the series of rebuttable presumptions that it spawns represent our Court of Appeals' attempt to balance the first client's right to preserve its confidences against the second client's right to counsel of its own choosing (*Schiessle*, 717 F.2d at 419–20; *Freeman*, 689 F.2d at 721). Preservation of client confidences has quite properly been given the greater weight in that balancing. As *Westinghouse II*, 588 F.2d at 225 put the matter:

> Doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification.

That weighing is reflected both in the presumptions of shared confidences and in the requirement that they be rebutted clearly and effectively.

Yet the Court of Appeals has also, and more recently, taught (*Schiessle*, 717 F.2d at 420, quoting *Freeman*, 689 F.2d at 721):

> [W]e have continuously maintained that disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary."

In this case several factors suggest it is not necessary to disqualify Beigel.

First and most important, the only information to which Beigel is presumed to have had access related to Berrettini's financial statements and investments for the period ending in 1981. That information, while relevant to this case in the broad sense discussed earlier, would be of extremely attenuated value to Beigel's new clients. While this Court would never describe a client's interest in preserving his confidenc-

---

10. It should be emphasized that this is not at all a finding that this Court disbelieves Beigel or bases its conclusion on a determination that his affidavit is not credible. Instead it is the evidentiary standard that prevents accepting his affidavit as conclusive. At the risk of being misunderstood in the analogy chosen, it would be equally true that a person charged with dishonesty cannot "clearly and effectively" disprove the charge by saying "I am telling the truth—you have my word." As the standard is stated, more is needed: Beigel must also adduce other facts showing his veracity.

es as insubstantial, any potential harm to Berrettini *in this litigation* is small.

Second, Beigel has represented plaintiffs for over a year and has had ample opportunity to share whatever confidences and secrets he may have had. In that sense the damage (if any) is done—and disqualification of B & S cannot undo it. Disqualification now will provide defendants with a major tactical advantage over plaintiffs in this case, but it is not likely to preserve the limited confidential information Beigel is presumed to have obtained from Berrettini over five years ago—and the latter is the only legitimate purpose of a disqualification order.

Third, plaintiffs will be substantially prejudiced by disqualification of their attorneys, and they are entirely innocent in the affair. Given the inability to safeguard Berrettini's legitimate expectations at this time, there is little (if any) justification for imposing on innocent bystanders the cost of obtaining new counsel and bringing those new counsel up to speed.

There appears to be only one potentially countervailing consideration here: the deterrent effect of a disqualification order on attorneys generally. If attorneys know they will be disqualified even after lengthy representation, they will be more likely to check carefully to avoid conflicts before accepting representation. This is, of course, the classic justification for applying a prophylactic rule even though it may appear to operate with great severity in the case at hand.[11]

But this is surely a poor case for imparting such a lesson. To discover this presumed conflict when he accepted the current representation in mid–1986, Beigel would have had (1) to determine that a partner with whom he had not been associated for three years had once handled the OET litigation, (2) to learn that Berrettini was a principal of OET and had a confidential relationship with Beigel's former partner [12] and (3) to discover enough about the OET litigation to determine whether Berrettini would have been likely to divulge information of relevance in this case. Even the most conscientious attorney applying the most meticulous procedures would have been unlikely to determine that a conflict existed—if in fact there were any. Even if Beigel had determined Berrettini was a former client of B & B, the OET litigation is not facially "substantially related" to this case, so he might reasonably have proceeded. As already discussed, whether the two representations are substantially related is an exceedingly close question.

On balance, there is very little to recommend disqualification in these circumstances, and disqualification is far from "absolutely necessary." Nonetheless, in *Schiessle* the Court of Appeals disqualified a law firm that had represented the plaintiffs for over two years, without hinting that the delay had any inhibiting effect on its decision to reach that result. But *Schiessle* involved a clear case of lawyers' neglect of their duty to avoid conflicts, where the deterrent effect of disqualification is obvious. There the lawyer who had changed firms had been the partner in charge of the case for some defendants, and had even communicated with members of his new law firm on their behalf (717 F.2d at 418–19). When he changed firms he had to have been aware of the conflict. Yet rather than erect the Chinese walls that might have allowed his firm to continue repre-

---

**11.** Less than two weeks ago the Supreme Court faced a similar decision in applying the judicial disqualification provision of 28 U.S.C. § 455(a) in *Liljeberg v. Health Services Acquisition Corp.,* — U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). *Liljeberg* generated a major split within the Court not only on the appropriateness of disqualification but, more importantly for the question just posed in the text, on the factor the five-Justice majority put in these terms (*id.* at ——, 108 S.Ct. at 2205–2207):

> Moreover, providing relief in cases such as this will not produce injustice in other cases;

to the contrary, the Court of Appeals' willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.

**12.** That might not be an easy task. B & B's retainer agreement was with OET, so it seems most probable Berrettini himself would not have appeared on B & B's records as a client.

senting the plaintiffs, he simply avoided discussing the case (*id.* at 419).

It would be hard to imagine a stronger case for disqualification than *Schiessle,* so there is little wonder that the Court of Appeals did not pause over the extended time before disqualification took place. By contrast, the present case is a weak one for disqualification even without considering the passage of time involved. *Schiessle* does not alter the balance that militates against disqualification here.

### Conclusion

Defendants' motion to disqualify plaintiffs' attorneys is denied. True enough, the artificial construct prescribed by the cases in this area—a pyramiding of presumptions—creates the technical basis for possible disqualification. But under all the circumstances here, that drastic measure is not called for.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's June 28, 1988 memorandum opinion and order (the "Opinion") denied the motion of three of the six defendants in this action (collectively "Defendants") for disqualification of plaintiffs' counsel Herbert Beigel ("Beigel") and his present law firm—a motion predicated on the fact that another law firm with which Beigel was once associated had once represented one of the defendants, Morando Berrettini ("Berrettini"), in a different matter.[1] Now Defendants seek (1) reconsideration of the Opinion or alternatively (2) certification of the issues for interlocutory appeal. For the reasons briefly stated in this supplement to the Opinion, both branches of the motion are denied.

Courts give the careful scrutiny they do to the factors supporting disqualification primarily in order to promote the basic purpose of the Code of Professional Responsibility: to foster adherence to the ethics of the legal profession. Litigants are typically less public-policy-minded, for disqualification of the adversary's lawyer is most frequently a powerful tactical weapon. This case is no exception to the latter proposition, and this Court declines Defendants' renewed invitation to sacrifice the real interests of justice by adopting a wooden adherence to the formulas Defendants urge.

Anyone reading the Opinion must realize how many stretches in logic it took to find that Defendants met the standards expressed in the case law. It is worth ticking them off briefly:

1. There is nothing in common—no point of intersection—between (a) the matter in which Barnett is theoretically viewed as having represented Berrettini while Beigel was Barnett's partner (a partnership that ended April 1, 1983) and (b) the current matter, in which Beigel undertook plaintiffs' representation more than three years later, except for one slice of *possibly* relevant information: Berrettini's financial condition in 1980, or perhaps from 1979 through 1981.[2]

2. That information, to be sure, had some plausibility (though not any necessity) as a subject of disclosure to Barnett in the earlier OET litigation. But plainly it is not directly relevant to the one issue to which it might even conceivably be connected in *this* case: "plaintiffs' assertions that the COPCO principals (1) commingled COPCO partnership monies with funds for other ventures and (2) used COPCO partnership funds for personal

---

1. This supplement will assume familiarity with the Opinion and will follow its terminology. Accordingly the definitions employed in the Opinion will be adhered to without further repetition, as will any references to cases cited in the Opinion.

2. That possible area of disclosure was all that survived scrutiny in Opinion at 114. More directly relevant information, that relating to COPCO itself, was also urged as a likely subject

of disclosure by Defendants, but it was flatly rejected by Opinion at 113–14. Given the fact that the entire subject of disqualification is one in which Defendants have to rely on the piling of inference on inference, this Court may be pardoned if it draws its own inference, derived from the several wholly untenable arguments that Defendants advance to support their disqualification motion, as to Defendants' real motivation in bringing the motion.

purposes" (Opinion at 114). What Opinion at 115 consequently had to fall back on was this substantially more tenuous holding:

> Berrettini's financial condition is relevant—in the sense of logically probative—to plaintiffs' claims, even if only marginally or tangentially so.

3. Even as to that very limited potential for relevance, the connection is rendered even more attenuated by the several years' time differential between the operative facts in the two cases and by what that time lapse indicates about any possible probative force here of the information that Barnett *may* have gotten in the OET litigation (Opinion at 115):

> In the OET litigation the issue was Berrettini's financial position as of October 1980, but here the issue is his motive to commingle or misapply funds in 1983. Plaintiffs are quite right in urging such a time difference substantially reduces the probative force in this case of any information Barnett is likely to have obtained in the OET litigation. But the lapse of time does not totally deprive that information of logical relevance.

Again this Court had to supply a linkup by pointing to purely marginal relevance (*id.*):

> It must also be remembered that the standard applicable here is one that bears on the lawyer's total activity in preparing a lawsuit, not simply on the admissibility of evidence at trial. That brings into play a criterion related to the low threshold of Fed.R.Civ.P. 26(b)(1)—for example, whether the information could be used in helping an attorney frame discovery requests.

4. Beigel specifically denied having received any confidential information from Barnett, and Beigel expressly says he never heard Berrettini's name at all

before 1986. Barnett confirms he has no recollection of discussing OET (let alone Berrettini) with Beigel. Opinion at 116–18 had to jump through several hoops in looking at the question whether the presumption of shared confidences had been "clearly and effectively" rebutted (the *Schiessle–Freeman* test) before concluding (Opinion at 118):

> Once more, however, Defendants have scored only a close-won victory on the issue.

Indeed, if this Court is invited to reconsider the Opinion on the merits, this is the only question that might seriously merit reconsideration for a different conclusion—one on which Defendants would lose rather than win.

It was in that total factual and legal matrix that the Opinion at 118–20 rejected Beigel's disqualification. What Defendants again prefer to ignore, with their current insistence that disqualification must follow inexorably from the subsidiary conclusions just summarized, is that their whole position depends on multiplying fractions. At least under the circumstances of this case, a balancing of harms[3] is appropriate. And it does not take much mathematics to recognize that Defendants' series of barely successful positions (barely arrived at even by indulging all inferences in their favor) makes for an extraordinarily tenuous end result—thus a litigant's four "successes" (say) by a 51% preponderance on each means that the litigant's likelihood of being right on all four conditions reduces to about 1 in 15.

When we compare (1) the extremely low probability of any prejudice of the type that Defendants insist must be presumed with (2) the demonstrable prejudice that disqualification would work on the wholly innocent plaintiffs,[4] no reason appears for reexamining the Opinion. Nor will the is-

---

**3.** Though the situations are not of course entirely parallel, such a balancing is conceptually not unlike the analytical process followed in determining the appropriateness of preliminary injunctive relief (see, e.g., *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387–88 (7th Cir.1984)).

**4.** This is not to mention the high probability, ignoring the artificial presumptions erected by the analysis, that Beigel is *in fact* without any information at all about Berrettini, let alone any information that would have any possible bearing on this lawsuit.

sues be certified for current appeal, for that would simply facilitate Defendants' accomplishment of the goal that a successful motion to disqualify would have accomplished: It would disable plaintiffs' effectiveness in getting this two-year-old case into a posture of readiness for trial. Defendants' motion is denied.